# UNITED STATES *v.* NEW YORK TELEPHONE CO.

No. 76–835.   Argued October 3, 1977—Decided December 7, 1977

*Deputy Solicitor General Wallace* argued the cause for the United States and was on the brief as Acting Solicitor General. With him on the brief were *Assistant Attorney General Civiletti, Deputy Solicitor General Randolph, Harriet S. Shapiro, Jerome M. Feit,* and *Marc Philip Richman.*

*George E. Ashley* argued the cause for respondent. With him on the brief was *Frank R. Natoli.*

MR. JUSTICE WHITE delivered the opinion of the Court.

This case presents the question of whether a United States District Court may properly direct a telephone company to provide federal law enforcement officials the facilities and technical assistance necessary for the implementation of its order authorizing the use of pen registers[1] to investigate offenses which there was probable cause to believe were being committed by means of the telephone.

I

On March 19, 1976, the United States District Court for the Southern District of New York issued an order authorizing agents of the Federal Bureau of Investigation (FBI) to install and use pen registers with respect to two telephones and directing the New York Telephone Co. (Company) to furnish the FBI "all information, facilities and technical assistance" necessary to employ the pen registers unobtrusively. The FBI was ordered to compensate the Company at prevailing rates for any assistance which it furnished. App. 6–7. The order was issued on the basis of an affidavit sub-

---

[1] A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed.

mitted by an FBI agent which stated that certain individuals were conducting an illegal gambling enterprise at 220 East 14th Street in New York City and that, on the basis of facts set forth therein, there was probable cause to believe that two telephones bearing different numbers were being used at that address in furtherance of the illegal activity. *Id.,* at 1–5. The District Court found that there was probable cause to conclude that an illegal gambling enterprise using the facilities of interstate commerce was being conducted at the East 14th Street address in violation of 18 U. S. C. §§ 371 and 1952, and that the two telephones had been, were currently being, and would continue to be used in connection with those offenses. Its order authorized the FBI to operate the pen registers with respect to the two telephones until knowledge of the numbers dialed led to the identity of the associates and confederates of those believed to be conducting the illegal operation or for 20 days, "whichever is earlier."

The Company declined to comply fully with the court order. It did inform the FBI of the location of the relevant "appearances," that is, the places where specific telephone lines emerge from the sealed telephone cable. In addition, the Company agreed to identify the relevant "pairs," or the specific pairs of wires that constituted the circuits of the two telephone lines. This information is required to install a pen register. The Company, however, refused to lease lines to the FBI which were needed to install the pen registers in an unobtrusive fashion. Such lines were required by the FBI in order to install the pen registers in inconspicuous locations away from the building containing the telephones. A "leased line" is an unused telephone line which makes an "appearance" in the same terminal box as the telephone line in connection with which it is desired to install a pen register. If the leased line is connected to the subject telephone line, the pen register can then be installed on the leased line at a remote location and be monitored from that point. The

Company, instead of providing the leased lines, which it conceded that the court's order required it to do, advised the FBI to string cables from the "subject apartment" to another location where pen registers could be installed. The FBI determined after canvassing the neighborhood of the apartment for four days that there was no location where it could string its own wires and attach the pen registers without alerting the suspects,[2] in which event, of course, the gambling operation would cease to function. App. 15–22.

On March 30, 1976, the Company moved in the District Court to vacate that portion of the pen register order directing it to furnish facilities and technical assistance to the FBI in connection with the use of the pen registers on the ground that such a directive could be issued only in connection with a wiretap order conforming to the requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. §§ 2510–2520 (1970 ed. and Supp. V). It contended that neither Fed. Rule Crim. Proc. 41 nor the All Writs Act, 28 U. S. C. § 1651 (a), provided any basis for such an order. App. 10–14. The District Court ruled that pen registers are not governed by the proscriptions of Title III because they are not devices used to intercept oral communications. It concluded that it had jurisdiction to authorize the installation of the pen registers upon a showing of probable cause and that both the All Writs Act and its inherent powers provided authority for the order directing the Company to assist in the installation of the pen registers.

On April 9, 1976, after the District Court and the Court of Appeals denied the Company's motion to stay the pen register order pending appeal, the Company provided the leased lines.[3]

---

[2] The gambling operation was known to employ countersurveillance techniques. App. 21.

[3] On the same date another United States District Court judge extended the original order of March 19 for an additional 20 days. *Id.,* at 33.

The Court of Appeals affirmed in part and reversed in part, with one judge dissenting on the ground that the order below should have been affirmed in its entirety. *Application of United States in re Pen Register Order*, 538 F. 2d 956 (CA2 1976). It agreed with the District Court that pen registers do not fall within the scope of Title III and are not otherwise prohibited or regulated by statute. The Court of Appeals also concluded that district courts have the power, either inherently or as a logical derivative of Fed. Crim. Proc. 41, to authorize pen register surveillance upon an adequate showing of probable cause. The majority held, however, that the District Court abused its discretion in ordering the Company to assist in the installation and operation of the pen registers. It assumed, *arguendo*, that "a district court has inherent discretionary authority or discretionary power under the All Writs Act to compel technical assistance by the Telephone Company," but concluded that "in the absence of specific and properly limited Congressional action, it was an abuse of discretion for the District Court to order the Telephone Company to furnish technical assistance." 538 F. 2d, at 961.[4] The majority expressed concern that "such an order could establish a most undesirable, if not dangerous and unwise, precedent for the authority of federal courts to impress unwilling aid on private third parties" and that "there is no assurance that the court will always be able to protect [third parties] from excessive or overzealous Government activity or compulsion." *Id.*, at 962–963.[5]

---

[4] The Court of Appeals recognized that "without [the Company's] technical aid, the order authorizing the use of a pen register will be worthless. Federal law enforcement agents simply cannot implement pen register surveillance without the Telephone Company's help. The assistance requested requires no extraordinary expenditure of time or effort by [the Company]; indeed, as we understand it, providing lease or private lines is a relatively simple, routine procedure." 538 F. 2d, at 961–962.

[5] Judge Mansfield dissented in part on the ground that the District Court possessed a discretionary power under the All Writs Act to direct the

We granted the United States' petition for certiorari challenging the Court of Appeals' invalidation of the District Court's order against respondent.[6]   429 U. S. 1072.

## II

We first reject respondent's contention, which is renewed here, that the District Court lacked authority to order the Company to provide assistance because the use of pen registers may be authorized only in conformity with the procedures set forth in Title III [7] for securing judicial authority to inter-

Company to render such assistance as was necessary to implement its valid order authorizing the use of pen registers and that a compelling case had been established for the exercise of discretion in favor of the assistance order.   He argued that district court judges could be trusted to exercise their powers under the All Writs Act only in cases of clear necessity and to balance the burden imposed upon the party required to render assistance against the necessity.

[6] Although the pen register surveillance had been completed by the time the Court of Appeals issued its decision on July 13, 1976, this fact does not render the case moot, because the controversy here is one "capable of repetition, yet evading review." *Southern Pacific Terminal Co.* v. *ICC*, 219 U. S. 498, 515 (1911); *Roe* v. *Wade*, 410 U. S. 113, 125 (1973).   Pen register orders issued pursuant to Fed. Rule Crim. Proc. 41 authorize surveillance only for brief periods.   Here, despite expedited action by the Court of Appeals, the order, as extended, expired six days after oral argument.   Moreover, even had the pen register order been stayed pending appeal, the mootness problem would have remained, because the showing of probable cause upon which the order authorizing the installation of the pen registers was based would almost certainly have become stale before review could have been completed.   It is also plain, given the Company's policy of refusing to render voluntary assistance in installing pen registers and the Government's determination to continue to utilize them, that the Company will be subjected to similar orders in the future.   See *Weinstein* v. *Bradford*, 423 U. S. 147, 149 (1975).

[7] The Court of Appeals held that pen register surveillance was subject to the requirements of the Fourth Amendment.   This conclusion is not challenged by either party, and we find it unnecessary to consider the matter. The Government concedes that its application for the pen register order did not conform to the requirements of Title III.

cept wire communications.[8]  Both the language of the statute and its legislative history establish beyond any doubt that pen registers are not governed by Title III.[9]

Title III is concerned only with orders "authorizing or approving the *interception* of a wire or oral communication . . . ."  18 U. S. C. § 2518 (1)  (emphasis added).[10] Congress defined "intercept" to mean "the *aural* acquisition of the *contents* of any wire or oral *communication* through the use of any electronic, mechanical, or other device."  18 U. S. C.

---

[8] Although neither this issue nor that of the scope of Fed. Rule Crim. Proc. 41 is encompassed within the question posed in the petition for certiorari and the Company has not filed a cross-petition, we have discretion to consider them because the prevailing party may defend a judgment on any ground which the law and the record permit that would not expand the relief it has been granted. *Langnes* v. *Green,* 282 U. S. 531, 538–539 (1931); *Dandridge* v. *Williams,* 397 U. S. 471, 475 n. 6 (1970).  The only relief sought by the Company is that granted by the Court of Appeals: the reversal of the District Court's order directing it to assist in the installation and operation of the pen registers.  The Title III and Rule 41 questions were considered by both the District Court and the Court of Appeals and fully argued here.

[9] Four Justices reached this conclusion in *United States* v. *Giordano,* 416 U. S. 505, 553–554 (1974) (POWELL, J., joined by BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., concurring in part and dissenting in part).  The Court's opinion did not reach the issue since the evidence derived from a pen register was suppressed as being in turn derived from an illegal wire interception.  Every Court of Appeals that has considered the matter has agreed that pen registers are not within the scope of Title III.  See *United States* v. *Illinois Bell Tel. Co.,* 531 F. 2d 809 (CA7 1976); *United States* v. *Southwestern Bell Tel. Co.,* 546 F. 2d 243 (CA8 1976); *Michigan Bell Tel. Co.* v. *United States,* 565 F. 2d 385 (CA6 1977); *United States* v. *Falcone,* 505 F. 2d 478 (CA3 1974), cert. denied, 420 U. S. 955 (1975); *Hodge* v. *Mountain States Tel. & Tel. Co.,* 555 F. 2d 254 (CA9 1977); *United States* v. *Clegg,* 509 F. 2d 605, 610 n. 6 (CA5 1975).

[10] Similarly, the sanctions of Title III are aimed only at one who "willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication . . . ."  18 U. S. C. § 2511 (1) (a).

§ 2510 (4) (emphasis added). Pen registers do not "intercept" because they do not acquire the "contents" of communications, as that term is defined by 18 U. S. C. § 2510 (8).[11] Indeed, a law enforcement official could not even determine from the use of a pen register whether a communication existed. These devices do not hear sound. They disclose only the telephone numbers that have been dialed—a means of establishing communication. Neither the purport of any communication between the caller and the recipient of the call, their identities, nor whether the call was even completed is disclosed by pen registers. Furthermore, pen registers do not accomplish the "aural acquisition" of anything. They decode outgoing telephone numbers by responding to changes in electrical voltage caused by the turning of the telephone dial (or the pressing of buttons on pushbutton telephones) and present the information in a form to be interpreted by sight rather than by hearing.[12]

The legislative history confirms that there was no congressional intent to subject pen registers to the requirements of Title III. The Senate Report explained that the definition of "intercept" was designed to exclude pen registers:

"Paragraph 4 [of § 2510] defines 'intercept' to include the aural acquisition of the contents of any wire or oral communication by any electronic, mechanical, or other device. Other forms of surveillance are not within the proposed legislation. . . . The proposed legislation is not designed to prevent the tracing of phone calls. The use of a 'pen register,' for example, would be permissible. But see United States v. Dote, 371 F. 2d 176 (7th 1966). The proposed legislation is intended to protect the privacy of the communication itself and not the means of

---

[11] " 'Contents' . . . includes any information concerning the identity of the parties to [the] communication or the existence, substance, purport, or meaning of [the] communication."

[12] See 538 F. 2d, at 957.

communication." S. Rep. No. 1097, 90th Cong., 2d Sess., 90 (1968).[13]

It is clear that Congress did not view pen registers as posing a threat to privacy of the same dimension as the interception of oral communications and did not intend to impose Title III restrictions upon their use.

## III

We also agree with the Court of Appeals that the District Court had power to authorize the installation of the pen registers.[14] It is undisputed that the order in this case was predicated upon a proper finding of probable cause, and no claim is made that it was in any way inconsistent with the

---

[13] United States v. Dote, 371 F. 2d 176 (CA7 1966), held that § 605 of the Communications Act of 1934, 47 U. S. C. § 605, which prohibited the interception and divulgence of "any communication" by wire or radio, included pen registers within the scope of its ban. In § 803 of Title III, 82 Stat. 223, Congress amended § 605 by restricting it to the interception of "any radio communication." Thus it is clear that pen registers are no longer within the scope of § 605. See Korman v. United States, 486 F. 2d 926, 931–932 (CA7 1973). The reference to Dote in the Senate Report is indicative of Congress' intention not to place restrictions upon their use. We find no merit in the Company's suggestion that the reference to Dote is merely an oblique expression of Congress' desire that telephone companies be permitted to use pen registers in the ordinary course of business, as Dote allowed, so long as they are not used to assist law enforcement. Brief for Respondent 16. The sentences preceding the reference to Dote state unequivocally that pen registers are not within the scope of Title III. In addition, a separate provision of Title III, 18 U. S. C. § 2511 (2) (a) (i), specifically excludes all normal telephone company business practices from the prohibitions of the Act. Congress clearly intended to disavow Dote to the extent that it prohibited the use of pen registers by law enforcement authorities.

[14] The Courts of Appeals that have considered the question have agreed that pen register orders are authorized by Fed. Rule Crim. Proc. 41 or by an inherent power closely akin to it to issue search warrants under circumstances conforming to the Fourth Amendment. See Michigan Bell Tel. Co., supra; Southwestern Bell Tel. Co., supra; Illinois Bell Tel. Co., supra.

Fourth Amendment. Federal Rule Crim. Proc. 41 (b) author-
izes the issuance of a warrant to:

> "search for and seize any (1) property that constitutes
> evidence of the commission of a criminal offense; or
> (2) contraband, the fruits of crime, or things otherwise
> criminally possessed; or (3) property designed or intended
> for use or which is or has been used as the means of com-
> mitting a criminal offense."

This authorization is broad enough to encompass a "search"
designed to ascertain the use which is being made of a tele-
phone suspected of being employed as a means of facilitating
a criminal venture and the "seizure" of evidence which the
"search" of the telephone produces. Although Rule 41 (h)
defines property "to include documents, books, papers and
any other tangible objects," it does not restrict or purport to
exhaustively enumerate all the items which may be seized
pursuant to Rule 41.[15] Indeed, we recognized in *Katz* v.
*United States,* 389 U. S. 347 (1967), which held that telephone
conversations were protected by the Fourth Amendment, that
Rule 41 is not limited to tangible items but is sufficiently
flexible to include within its scope electronic intrusions author-
ized upon a finding of probable cause. 389 U. S., at 354–356,
and n. 16.[16] See also *Osborn* v. *United States,* 385 U. S. 323,
329–331 (1966).

---

[15] Where the definition of a term in Rule 41 (h) was intended to be all
inclusive, it is introduced by the phrase "to mean" rather than "to include."
Cf. *Helvering* v. *Morgan's, Inc.,* 293 U. S. 121, 125 n. 1 (1934).

[16] The question of whether the FBI, in its implementation of the
District Court's pen register authorization, complied with all the require-
ments of Rule 41 is not before us. In *Katz,* the Court stated that the
notice requirement of Rule 41 (d) is not so inflexible as to require invariably
that notice be given the person "searched" prior to the commencement of
the search. 389 U. S., at 355–356, n. 16. Similarly, it is clear to us that
the requirement of Rule 41 (c) that the warrant command that the
search be conducted within 10 days of its issuance does not mean that
the duration of a pen register surveillance may not exceed 10 days. Thus

■■■■■■■■

■■■■■■■■■

Our conclusion that Rule 41 authorizes the use of pen registers under appropriate circumstances is supported by Fed. Rule Crim. Proc. 57 (b), which provides: "If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute." [17] Although we need not and do not decide whether Rule 57 (b) by itself would authorize the issuance of pen register orders, it reinforces our conclusion that Rule 41 is sufficiently broad to include seizures of intangible items such as dial impulses recorded by pen registers as well as tangible items.

Finally, we could not hold that the District Court lacked any power to authorize the use of pen registers without defying the congressional judgment that the use of pen registers "be permissible." S. Rep. No. 1097, *supra*, at 90. Indeed, it would be anomalous to permit the recording of conversations by means of electronic surveillance while prohibiting the far lesser intrusion accomplished by pen registers. Congress intended no such result. We are unwilling to impose it in the absence of some showing that the issuance of such orders would be inconsistent with Rule 41. Cf. Rule 57 (b), *supra*.[18]

---

the District Court's order, which authorized surveillance for a 20-day period, did not conflict with Rule 41.

[17] See *United States* v. *Baird*, 414 F. 2d 700, 710 (CA2 1969), cert. denied, 396 U. S. 1005 (1970); *Jackson* v. *United States*, 122 U. S. App. D. C. 324, 326, 353 F. 2d 862, 864 (1965); *United States* v. *Remolif*, 227 F. Supp. 420, 423 (Nev. 1964); *Link* v. *Wabash R. Co.*, 370 U. S. 626, 633 n. 8 (1962) (applying the analogous provision of Fed. Rule Civ. Proc. 83).

[18] The dissent argues, *post*, at 182–184, that Rule 41 (b), as modified following *Warden* v. *Hayden*, 387 U. S. 294 (1967), to explicitly authorize searches for any property that constitutes evidence of a crime, falls short of authorizing warrants to "search" for and "seize" intangible evidence. The elimination of the restriction against seizing property that is "mere evidence," however, has no bearing whatsoever on the scope of the definition of property set forth in Rule 41 (h) which, as the dissent acknowledges, remained unchanged. Moreover, the definition of property set forth in

## IV

The Court of Appeals held that even though the District Court had ample authority to issue the pen register warrant and even assuming the applicability of the All Writs Act, the order compelling the Company to provide technical assistance constituted an abuse of discretion. Since the Court of Appeals conceded that a compelling case existed for requiring the assistance of the Company and did not point to any fact particular to this case which would warrant a finding of abuse of discretion, we interpret its holding as generally barring district courts from ordering any party to assist in the installation or operation of a pen register. It was apparently concerned that sustaining the District Court's order would authorize courts to compel third parties to render assistance without limitation regardless of the burden involved and pose a severe threat to the autonomy of third parties who for whatever reason prefer not to render such assistance. Consequently the Court of Appeals concluded that courts should not

---

Rule 41 (h) is introduced by the phrase, "[t]he term 'property' is used in this rule to *include*" (emphasis added), which indicates that it was not intended to be exhaustive. See *supra*, at 169.

We are unable to comprehend the logic supporting the dissent's contention, *post*, at 184–185, that the conclusion of *Katz* v. *United States* that Rule 41 was not confined to tangible property did not survive the enactment of Title III and Title IX of the Omnibus Crime Control and Safe Streets Act of 1968, because Congress failed to expand the definition of property contained in Rule 41 (h). There was obviously no need for any such action in light of the Court's construction of the Rule in *Katz*. The dissent's assertion that it "strains credulity" to conclude that Congress intended to permit the seizure of intangibles outside the scope of Title III without its safeguards disregards the congressional judgment that the use of pen registers be permissible without Title III restrictions. Indeed, the dissent concedes that pen registers are not governed by Title III. What "strains credulity" is the dissent's conclusion, directly contradicted by the legislative history of Title III, that Congress intended to permit the interception of telephone conversations while prohibiting the use of pen registers to obtain much more limited information.

embark upon such a course without specific legislative author-
ization. We agree that the power of federal courts to impose
duties upon third parties is not without limits; unreasonable
burdens may not be imposed. We conclude, however, that
the order issued here against respondent was clearly author-
ized by the All Writs Act and was consistent with the intent
of Congress.[19]

The All Writs Act provides:

"The Supreme Court and all courts established by Act
of Congress may issue all writs necessary or appropriate
in aid of their respective jurisdictions and agreeable to
the usages and principles of law." 28 U. S. C. § 1651 (a).

The assistance of the Company was required here to imple-
ment a pen register order which we have held the District
Court was empowered to issue by Rule 41. This Court has
repeatedly recognized the power of a federal court to issue
such commands under the All Writs Act as may be necessary
or appropriate to effectuate and prevent the frustration of
orders it has previously issued in its exercise of jurisdiction
otherwise obtained: "This statute has served since its inclu-
sion, in substance, in the original Judiciary Act as a 'legisla-
tively approved source of procedural instruments designed to
achieve "the rational ends of law." ' " Harris v. Nelson, 394
U. S. 286, 299 (1969), quoting Price v. Johnston, 334 U. S.
266, 282 (1948). Indeed, "[u]nless appropriately confined by

---

[19] The three other Courts of Appeals which have considered the question
reached a different conclusion from the Second Circuit. The Sixth Circuit
in Michigan Bell Tel. Co. v. United States, 565 F. 2d 385 (1977), and the
Seventh Circuit in United States v. Illinois Bell Tel. Co., 531 F. 2d 809
(1976), held that the Act did authorize the issuance of orders compel-
ling a telephone company to assist in the use of surveillance devices not
covered by Title III such as pen registers. The Eighth Circuit found such
authority to be part of the inherent power of district courts and "con-
comitant of the power to authorize pen register surveillance." United
States v. Southwestern Bell Tel. Co., 546 F. 2d, at 246.

Congress, a federal court may avail itself of all auxiliary writs as aids in the performance of its duties, when the use of such historic aids is calculated in its sound judgment to achieve the ends of justice entrusted to it." *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 273 (1942).

The Court has consistently applied the Act flexibly in conformity with these principles. Although § 262 of the Judicial Code, the predecessor to § 1651, did not expressly authorize courts, as does § 1651, to issue writs "appropriate" to the proper exercise of their jurisdiction but only "necessary" writs, *Adams* held that these supplemental powers are not limited to those situations where it is "necessary" to issue the writ or order "in the sense that the court could not otherwise physically discharge its appellate duties." 317 U. S., at 273. In *Price* v. *Johnston, supra,* § 262 supplied the authority for a United States Court of Appeals to issue an order commanding that a prisoner be brought before the court for the purpose of arguing his own appeal. Similarly, in order to avoid frustrating the "very purpose" of 28 U. S. C. § 2255, § 1651 furnished the District Court with authority to order that a federal prisoner be produced in court for purposes of a hearing. *United States* v. *Hayman,* 342 U. S. 205, 220–222 (1952). The question in *Harris* v. *Nelson, supra,* was whether, despite the absence of specific statutory authority, the District Court could issue a discovery order in connection with a habeas corpus proceeding pending before it. Eight Justices agreed that the district courts have power to require discovery when essential to render a habeas corpus proceeding effective. The Court has also held that despite the absence of express statutory authority to do so, the Federal Trade Commission may petition for, and a Court of Appeals may issue, pursuant to § 1651, an order preventing a merger pending hearings before the Commission to avoid impairing or frustrating the Court of Appeals' appellate jurisdiction. *FTC* v. *Dean Foods Co.,* 384 U. S. 597 (1966).

The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, *Mississippi Valley Barge Line Co.* v. *United States,* 273 F. Supp. 1, 6 (ED Mo. 1967), summarily aff'd, 389 U. S. 579 (1968); *Board of Education* v. *York,* 429 F. 2d 66 (CA10 1970), cert. denied, 401 U. S. 954 (1971), and encompasses even those who have not taken any affirmative action to hinder justice. *United States* v. *McHie,* 196 F. 586 (ND Ill. 1912); *Field* v. *United States,* 193 F. 2d 92, 95–96 (CA2), cert. denied, 342 U. S. 894 (1951).[20]

Turning to the facts of this case, we do not think that the Company was a third party so far removed from the underlying controversy that its assistance could not be permissibly compelled. A United States District Court found that there was probable cause to believe that the Company's facilities were being employed to facilitate a criminal enterprise on a continuing basis. For the Company, with this knowledge, to refuse to supply the meager assistance required by the FBI in its efforts to put an end to this venture threatened obstruction of an investigation which would determine whether the Company's facilities were being lawfully used. Moreover, it can hardly be contended that the Company, a highly regulated public utility with a duty to serve the public,[21] had a substantial interest in not providing assistance. Certainly the use of pen registers is by no means offensive to it. The Company concedes that it regularly employs such devices without court order for the purposes of checking billing operations, detecting fraud, and

[20] See *Labette County Comm'rs* v. *Moulton,* 112 U. S. 217, 221 (1884): "[I]t does not follow because the jurisdiction in mandamus [now included in § 1651] is ancillary merely that it cannot be exercised over persons not parties to the judgment sought to be enforced."

[21] See 47 U. S. C. § 201 (a) and N. Y. Pub. Serv. Law § 91 (McKinney 1955 and Supp. 1977–1978).

preventing violations of law.[22]   It also agreed to supply the
FBI with all the information required to install its own pen
registers.   Nor was the District Court's order in any way
burdensome.   The order provided that the Company be fully
reimbursed at prevailing rates, and compliance with it required
minimal effort on the part of the Company and no disruption
to its operations.

Finally, we note, as the Court of Appeals recognized, that
without the Company's assistance there is no conceivable way
in which the surveillance authorized by the District Court
could have been successfully accomplished.[23]   The FBI, after
an exhaustive search, was unable to find a location where it
could install its own pen registers without tipping off the
targets of the investigation.   The provision of a leased line by
the Company was essential to the fulfillment of the purpose—
to learn the identities of those connected with the gambling
operation—for which the pen register order had been issued.[24]

---

[22] Tr. of Oral Arg. 27–28, 40.

[23] The dissent's attempt to draw a distinction between orders in aid of a
court's own duties and jurisdiction and orders designed to better enable a
party to effectuate his rights and duties, *post,* at 189–190, is specious.
Courts normally exercise their jurisdiction only in order to protect the
legal rights of parties.   In *Price* v. *Johnston,* 334 U. S. 266 (1948), for
example, the production of the federal prisoner in court was required in
order to enable him to effectively present his appeal which the court had
jurisdiction to hear.   Similarly, in *Harris* v. *Nelson,* 394 U. S. 286 (1969),
discovery was ordered in connection with a habeas corpus proceeding for
the purpose of enabling a prisoner adequately to protect his rights.   Here,
we have held that Fed. Rule Crim. Proc. 41 provided the District Court
with power to authorize the FBI to install pen registers.   The order issued
by the District Court compelling the Company to provide technical assist-
ance was required to prevent nullification of the court's warrant and the
frustration of the Government's right under the warrant to conduct a pen
register surveillance, just as the orders issued in *Price* and *Harris* were
necessary to protect the rights of prisoners.

[24] We are unable to agree with the Company's assertion that "it is
extraordinary to expect citizens to directly involve themselves in the law

The order compelling the Company to provide assistance was not only consistent with the Act but also with more recent congressional actions. As established in Part II, *supra,* Congress clearly intended to permit the use of pen registers by federal law enforcement officials. Without the assistance of the Company in circumstances such as those presented here, however, these devices simply cannot be effectively employed. Moreover, Congress provided in a 1970 amendment to Title III that "[a]n order authorizing the interception of a wire or oral communication shall, upon request of the applicant, direct that a communication common carrier . . . shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively . . . ." 18 U. S. C. § 2518 (4). In light of this direct

---

enforcement process." Tr. of Oral Arg. 41. The conviction that private citizens have a duty to provide assistance to law enforcement officials when it is required is by no means foreign to our traditions, as the Company apparently believes. See *Babington* v. *Yellow Taxi Corp.,* 250 N. Y. 14, 17, 164 N. E. 726, 727 (1928) (Cardozo, C. J.) ("Still, as in the days of Edward I, the citizenry may be called upon to enforce the justice of the state, not faintly and with lagging steps, but honestly and bravely and with whatever implements and facilities are convenient and at hand"). See also *In re Quarles and Butler,* 158 U. S. 532, 535 (1895) ("It is the duty . . . of every citizen, to assist in prosecuting, and in securing the punishment of, any breach of the peace of the United States"); *Hamilton* v. *Regents,* 293 U. S. 245, 265 n. (1934) (Cardozo, J., concurring); *Elrod* v. *Moss,* 278 F. 123, 129 (CA4 1921). The concept that citizens have a duty to assist in enforcement of the laws is at least in part the predicate of Fed. Rule Crim. Proc. 17, which clearly contemplates power in the district courts to issue subpoenas and subpoenas *duces tecum* to nonparty witnesses and to hold noncomplying, nonparty witnesses in contempt. Cf. *Roviaro* v. *United States,* 353 U. S. 53, 59 (1957) ("The [informer's] privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation"). Of course we do not address the question of whether and to what extent such a general duty may be legally enforced in the diverse contexts in which it may arise.

command to federal courts to compel, upon request, any assistance necessary to accomplish an electronic interception, it would be remarkable if Congress thought it beyond the power of the federal courts to exercise, where required, a discretionary authority to order telephone companies to assist in the installation and operation of pen registers, which accomplish a far lesser invasion of privacy.[25]   We are convinced that

[25] We reject the Court of Appeals' suggestion that the fact that Congress amended Title III to require that communication common carriers provide necessary assistance in connection with electronic surveillance within the scope of Title III reveals a congressional "doubt that the courts possessed inherent power to issue such orders" and therefore "it seems reasonable to conclude that similar authorization should be required in connection with pen register orders . . . ."  538 F. 2d, at 962.  The amendment was passed following the decision of the Ninth Circuit in *Application of United States*, 427 F. 2d 639 (1970), which held that absent specific statutory authority, a United States District Court was without power to compel a telephone company to assist in a wiretap conducted pursuant to Title III. The court refused to infer such authority in light of Congress' silence in a statute which constituted a "comprehensive legislative treatment" of wiretapping.  *Id.*, at 643.  We think that Congress' prompt action in amending the Act was not an acceptance of the Ninth Circuit's view but "more in the nature of an overruling of that opinion." *United States* v. *Illinois Bell Tel. Co.*, 531 F. 2d, at 813.  The meager legislative history of the amendment indicates that Congress was only providing an unequivocal statement of its intent under Title III.  See 115 Cong. Rec. 37192 (1969) (remarks of Sen. McClellan).  We decline to infer from a congressional grant of authority under these circumstances that such authority was previously lacking.  See *FTC* v. *Dean Foods Co.*, 384 U. S. 597, 608–612 (1966); *Wong Yang Sung* v. *McGrath*, 339 U. S. 33, 47 (1950).

Moreover, even if Congress' action were viewed as indicating acceptance of the Ninth Circuit's view that there was no authority for the issuance of orders compelling telephone companies to provide assistance in connection with wiretaps without an explicit statutory provision, it would not follow that explicit congressional authorization was also needed to order telephone companies to assist in the installation and operation of pen registers which, unlike wiretaps, are not regulated by a comprehensive statutory scheme. In any event, by amending Title III Congress has now required that at the Government's request telephone companies be directed to provide

to prohibit the order challenged here would frustrate the clear indication by Congress that the pen register is a permissible law enforcement tool by enabling a public utility to thwart a judicial determination that its use is required to apprehend and prosecute successfully those employing the utility's facilities to conduct a criminal venture. The contrary judgment of the Court of Appeals is accordingly reversed.

*So ordered.*

MR. JUSTICE STEWART, concurring in part and dissenting in part.

I agree that the use of pen registers is not governed by the requirements of Title III and that the District Court had authority to issue the order authorizing installation of the pen register, and so join Parts I, II, and III of the Court's opinion. However, I agree with MR. JUSTICE STEVENS that the District Court lacked power to order the telephone company to assist the Government in installing the pen register, and thus join Part II of his dissenting opinion.

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting in part.

Today's decision appears to present no radical departure from this Court's prior holdings. It builds upon previous intimations that a federal district court's power to issue a search warrant under Fed. Rule Crim. Proc. 41 is a flexible one, not strictly restrained by statutory authorization, and it applies the same flexible analysis to the All Writs Act, 28 U. S. C. § 1651 (a). But for one who thinks of federal courts as courts of limited jurisdiction, the Court's decision is difficult

---

assistance in connection with wire interceptions. It is plainly unlikely that Congress intended at the same time to leave federal courts without authority to require assistance in connection with pen registers.

to accept. The principle of limited federal jurisdiction is fundamental; never is it more important than when a federal court purports to authorize and implement the secret invasion of an individual's privacy. Yet that principle was entirely ignored on March 19 and April 2, 1976, when the District Court granted the Government's application for permission to engage in surveillance by means of a pen register, and ordered the respondent to cooperate in the covert operation.

Congress has not given the federal district courts the power either to authorize the use of a pen register, or to require private parties to assist in carrying out such surveillance. Those defects cannot be remedied by a patchwork interpretation of Rule 41 which regards the Rule as applicable as a grant of authority, but inapplicable insofar as it limits the exercise of such authority. Nor can they be corrected by reading the All Writs Act as though it gave federal judges the wide-ranging powers of an ombudsman. The Court's decision may be motivated by a belief that Congress would, if the question were presented to it, authorize both the pen register order and the order directed to the Telephone Company.[1] But the history and consistent interpretation of the federal court's power to issue search warrants conclusively show that, in these areas, the Court's rush to achieve a logical result must await congressional deliberation. From the beginning of our Nation's history, we have sought to prevent the accretion of arbitrary police powers in the federal courts; that accretion is no less dangerous and unprecedented because the first step appears to be only minimally intrusive.

I

Beginning with the Act of July 31, 1789, 1 Stat. 29, 43, and concluding with the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 197, 219, 238, Congress has enacted a

---

[1] In fact, Congress amended Title III when presented with a similar question. See *ante,* at 177–178, n. 25.

series of over 35 different statutes granting federal judges the power to issue search warrants of one form or another. These statutes have one characteristic in common: they are specific in their grants of authority and in their inclusion of limitations on either the places to be searched, the objects of the search, or the requirements for the issuance of a warrant.[2] This is not a random coincidence; it is a reflection of a concern deeply imbedded in our revolutionary history for the abuses that attend any broad delegation of power to issue search warrants. In the colonial period, the oppressive British practice of allowing courts to issue "general warrants" or "writs of assistance"[3] was one of the major catalysts of the struggle for independence.[4] After independence, one of the first state constitutions expressly provided that "no warrant ought to be issued but in cases, and with the formalities, prescribed by the laws."[5] This same principle motivated the adoption of

---

[2] The statutes enacted prior to 1945 are catalogued in the Appendix to Mr. Justice Frankfurter's eloquent dissent in *Davis* v. *United States,* 328 U. S. 582, 616–623.

[3] These writs authorized the indiscriminate search and seizure of undescribed persons or property based on mere suspicion. See N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 51–55 (1937). The writs of assistance were viewed as particularly oppressive. They commanded "all officers and subjects of the Crown to assist in their execution," and they were not returnable after execution, but rather served as continuous authority during the lifetime of the reigning sovereign. *Id.,* at 53–54.

[4] The importance of the colonial resistance to general writs and writs of assistance in our history has been emphasized in several Supreme Court cases, *e. g., Frank* v. *Maryland,* 359 U. S. 360, 363–365; *Henry* v. *United States,* 361 U. S. 98, 100–101; *Stanford* v. *Texas,* 379 U. S. 476, 481–485, and is set forth in detail in Lasson, *supra,* and Fraenkel, Concerning Searches and Seizures, 34 Harv. L. Rev. 361 (1921).

[5] Article XIV of the Massachusetts Constitution of 1780. The Fourth Amendment was patterned after this provision. See *Harris* v. *United States,* 331 U. S. 145, 158 (Frankfurter, J., dissenting).

the Fourth Amendment and the contemporaneous, specific legislation limiting judicial authority to issue search warrants.[6]

It is unnecessary to develop this historical and legislative background at any great length, for even the rough contours make it abundantly clear that federal judges were not intended to have any roving commission to issue search warrants. Quite properly, therefore, the Court today avoids the error committed by the Courts of Appeals which have held that a district court has "inherent power" to authorize the installation of a pen register on a private telephone line.[7] Federal courts have no such inherent power.[8]

---

[6] It was not until 1917 that Congress granted the federal courts, as part of the Espionage Act, broad powers to issue search warrants. 40 Stat. 217, 228 (allowing warrants for stolen property, property used in the commission of a felony, and property used to unlawfully aid a foreign government). These provisions of the Espionage Act formed the basis of Rule 41. See Notes of Advisory Committee on Rules, 18 U. S. C. App., p. 4512. It is clear that the Espionage Act did not delegate authority to issue all warrants compatible with the Fourth Amendment. After the Act, Congress continued to enact legislation authorizing search warrants for particular items, and the courts recognized that, if a warrant was not specifically authorized by the Act—or another congressional enactment— it was prohibited. See Colyer v. Skeffington, 265 F. 17, 45 (Mass. 1920), rev'd on other grounds, 277 F. 129 (CA1 1922). See also Warden v. Hayden, 387 U. S. 294, 308 n. 12.

[7] See United States v. Southwestern Bell Tel. Co., 546 F. 2d 243, 245 (CA8 1976); United States v. Illinois Bell Tel. Co., 531 F. 2d 809 (CA7 1976) (semble).

[8] I recognize that there are opinions involving warrantless electronic surveillance which assume that courts have some sort of nonstatutory power to issue search warrants. See United States v. Giordano, 416 U. S. 505, 554 (POWELL, J., concurring); Katz v. United States, 389 U. S. 347; Osborn v. United States, 385 U. S. 323. That assumption was not, however, necessary to the decisions in any of those cases, and Katz may rest on a reading of Fed. Rule Crim. Proc. 41, see discussion, infra, at 184–185. Admittedly, Osborn appears to rely in part on a nonstatutory order to permit a secret recording of a conversation with a lawyer who attempted to bribe a witness. But, as the Court subsequently made clear in United States v. White, 401 U. S. 745, prior judicial authorization was not a necessary element of that case. Moreover, since the court in Osborn was

While the Court's decision eschews the notion of inherent power, its holding that Fed. Rule Crim. Proc. 41 authorizes the District Court's pen register order is equally at odds with the 200-year history of search warrants in this country and ignores the plain meaning and legislative history of the very Rule on which it relies. Under the Court's reading of the Rule, the definition of the term "property" in the Rule places no limits on the objects of a proper search and seizure, but is merely illustrative. *Ante,* at 169. The Court treats Rule 41 as though it were a general authorization for district courts to issue any warrants not otherwise prohibited. *Ante,* at 170. This is a startling approach. On its face, the Rule grants no such open-ended authority. Instead, it follows in the steps of the dozens of enactments that preceded it: It limits the nature of the property that may be seized and the circumstances under which a valid warrant may be obtained. The continuing force of these limitations is demonstrated by the congressional actions which compose the Omnibus Crime Control and Safe Streets Act of 1968.

In Title III of that Act, Congress legislated comprehensively on the subject of wiretapping and electronic surveillance. Specifically, Congress granted federal judges the power to authorize electronic surveillance under certain carefully defined circumstances. As the Court demonstrates in Part II of its opinion (which I join), the installation of pen register devices is not encompassed within that authority. What the majority opinion fails to point out, however, is that in Title IX of that same Act, Congress enacted another, distinct provision extending the power of federal judges to issue search

concerned with the integrity of its own procedures, the argument that it possessed an inherent power to authorize a nonstatutory investigation had far greater strength than it has in the context of an ordinary criminal investigation. Cf. *American Tobacco Co.* v. *Werckmeister,* 146 F. 375 (CA2 1906), aff'd, 207 U. S. 284 (use of All Writs Act to seize goods in the support of the court's jurisdiction).

warrants. That statute, which formed the basis of the 1972 amendment to Rule 41, authorized the issuance of search warrants for an additional class of property, namely, "property that constitutes evidence of a criminal offense in violation of the laws of the United States." 18 U. S. C. § 3103a. In order to understand this provision, it must be remembered that, prior to 1967, "mere evidence" could not be the subject of a constitutionally valid seizure. *Gouled* v. *United States,* 255 U. S. 298. In *Warden* v. *Hayden,* 387 U. S. 294, this Court removed the constitutional objection to mere-evidence seizures. Title IX was considered necessary because, after *Warden* v. *Hayden,* there existed a category of property—mere evidence—which could be the subject of a valid seizure incident to an arrest, but which could not be seized pursuant to a warrant. The reason mere evidence could not be seized pursuant to a warrant was that, as Congress recognized, Rule 41 did not authorize warrants for evidence.[9] Title IX was enacted to fill this gap in the law.[10]

---

[9] In the edition of his treatise written after the decision in *Warden* v. *Hayden* in 1967 and prior to the 1972 amendment to Rule 41, Professor Wright acutely observed:

"Immediately after the Hayden decision there was an apparent anomaly, since the case held that evidence might be seized, but Rule 41 (b) did not authorize issuance of a search warrant for evidence. This would have meant that evidence might be seized where a search may permissibly be made without a warrant, but not in a search under warrant. This would have been wholly inconsistent with the strongly-held notion that, save in a few special classes of cases, a warrant should be a prerequisite to a search, and it would have encouraged police to search without a warrant. Congress, which can move more quickly than the rulemaking apparatus, responded by passage of a statute making it permissible to issue a search warrant for 'property that constitutes evidence of a criminal offense in violation of the laws of the United States.' This supplements, and may well soon swallow up, the other grounds for a search warrant set out in Rule 41 (b)." (Footnotes omitted.) 3 C. Wright, Federal Practice and Procedure § 664 (1969).

[10] See comments of Senator Allott, who introduced Title IX in the Senate, 114 Cong. Rec. 14790 (1968).

Two conclusions follow ineluctably from the congressional enactment of Title IX. First, Rule 41 was never intended to be a general authorization to issue any warrant not otherwise prohibited by the Fourth Amendment. If it had been, Congress would not have perceived a need to enact Title IX, since constitutional law, as it stood in 1968, did not prohibit the issuance of warrants for evidence.[11]

Second, the enactment of Title IX disproves the theory that the definition of "property" in Rule 41 (h) is only illustrative. This suggestion was first put forward by the Court in *Katz* v. *United States,* 389 U. S. 347. The issue was not briefed in *Katz,* but the Court, in dicta, indicated that Rule 41 was not confined to tangible property. Whatever the merits of that suggestion in 1967, it has absolutely no force at this time. In 1968 Congress comprehensively dealt with the issue of electronic searches in Title III. In the same Act, it provided authority for expanding the scope of property covered under Rule 41. But the definition of property in the Rule has never changed. Each item listed is tangible,[12] and the final reference to "and any other tangible items" surely must now be read as describing the outer limits of the included category.[13] It strains

[11] Indeed, under the Court's flexible interpretation of Rule 41, the entire series of statutes that belie the "inherent power" concept, was also an exercise in futility because the silence of Congress would not have prohibited any warrant that did not violate the Fourth Amendment. Many of these statutes remain in effect, *e. g.,* 49 U. S. C. § 782 (seizure of certain contraband); 19 U. S. C. § 1595 (customs duties; searches and seizures); and Rule 41 (h) expressly provides that Rule 41 "does not modify any act, inconsistent with it, regulating search, seizure and the issuance and execution of search warrants . . . ."

[12] Rule 41 (h) provides in part:

"The term 'property' is used in this rule to include documents, books, papers and any other tangible objects."

[13] The Court acknowledges that the amendment to Rule 41 (b) eliminated a "restriction" against the seizure of mere evidence. *Ante,* at 170–171, n. 18. What the Court refers to as a "restriction" was nothing more than silence—the absence of an express grant of authority. Since the

credulity to suggest that Congress, having carefully circumscribed the use of electronic surveillance in Title III, would then, in Title IX, expand judicial authority to issue warrants for the electronic seizure of "intangibles" without the safeguards of Title III.[14] In fact, the safeguards contained in Rule 41 make it absurd to suppose that its draftsmen thought they were authorizing any form of electronic surveillance. The paragraphs relating to issuance of the warrant, Rule 41 (c), the preparation of an inventory of property in the presence of the person whose property has been taken, Rule 41 (d), and the motion for a return of property, Rule 41 (e), are almost meaningless if read as relating to electronic surveillance of any kind.

To reach its result in this case, the Court has had to overlook

---

Rule is just as silent on the subject of seizing intangibles as it was on the subject of seizing mere evidence, it is difficult to understand why the Court does not recognize the same "restriction" against such seizures.

[14] The Court argues that it "would be anomalous to permit the recording of conversations by means of electronic surveillance while prohibiting the far lesser intrusion accomplished by pen registers." *Ante,* at 170. But respondent does not claim that *Congress* has prohibited the use of pen registers. Admittedly there is now no statute either permitting or prohibiting the use of such devices. If that use is a "search" within the meaning of the Fourth Amendment—a question the Court does not decide— there is nothing anomalous about concluding that it is a forbidden activity until Congress has prescribed the safeguards that should accompany any warrant to engage in it. Even if an anomaly does exist, it should be cured by Congress rather than by a loose interpretation of "property" under Rule 41 which may tolerate sophisticated electronic surveillance techniques never considered by Congress and presenting far greater dangers of intrusion than pen registers. See *Michigan Bell Tel. Co.* v. *United States,* 565 F. 2d 385 (CA6 1977) (indicating the increasing sophistication of surveillance techniques similar to pen registers); cf. *United States* v. *Pretzinger,* 542 F. 2d 517 (CA9 1976) (use of electronic tracking devices). It is significant that Title III limits the types of criminal investigations for which electronic surveillance may be used; no such limit is expressed in Rule 41 or is implicit in the Court's reasoning today.

the Rule's specific language, its specific safeguards, and its legislative background. This is an extraordinary judicial effort in such a sensitive area, and I can only regard it as most unwise. It may be that a pen register is less intrusive than other forms of electronic surveillance. Congress evidently thought so. See S. Rep. No. 1097, 90th Cong., 2d Sess., 90 (1968). But the Court should not try to leap from that assumption to the conclusion that the District Court's order here is covered by Rule 41. As I view this case, it is immaterial whether or not the attachment of a pen register to a private telephone line is a violation of the Fourth Amendment. If, on the one hand, the individual's privacy interest is not constitutionally protected, judicial intervention is both unnecessary and unauthorized. If, on the other hand, the constitutional protection is applicable, the focus of inquiry should not be whether Congress has prohibited the intrusion, but whether Congress has expressly authorized it, and no such authorization can be drawn from Rule 41. On either hypothesis, the order entered by the District Court on March 19, 1976, authorizing the installation of a pen register, was a nullity. It cannot, therefore, support the further order requiring the New York Telephone Company to aid in the installation of the device.

## II

Even if I were to assume that the pen register order in this case was valid, I could not accept the Court's conclusion that the District Court had the power under the All Writs Act, 28 U. S. C. § 1651 (a), to require the New York Telephone Company to assist in its installation. This conclusion is unsupported by the history, the language, or previous judicial interpretations of the Act.

The All Writs Act was originally enacted, in part, as § 14 of the Judiciary Act of 1789, 1 Stat. 81.[15] The Act was, and

---

[15] The statute was also derived from § 13 of the Judiciary Act, which concerned writs of mandamus and prohibition, 1 Stat. 80, and a statute

is, necessary because federal courts are courts of limited jurisdiction having only those powers expressly granted by Congress,[16] and the statute provides these courts with the procedural tools—the various historic common-law writs—necessary for them to exercise their limited jurisdiction.[17] The statute does not contain, and has never before been interpreted as containing, the open-ended grant of authority to federal courts that today's decision purports to uncover. Instead, in the language of the statute itself, there are two fundamental limitations on its scope. The *purpose* of any order authorized by the Act must be to aid the court in the exercise of its jurisdiction;[18] and the *means* selected must be analogous to a common-law writ. The Court's opinion ignores both limitations.

---

dealing with writs of *ne exeat*, 1 Stat. 334. The All Writs Act now reads:

"(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

[16] This proposition was so well settled by 1807 that Mr. Chief Justice Marshall needed no citation to support the following statement:

"As preliminary to any investigation of the merits of this motion, this court deems it proper to declare that it disclaims all jurisdiction not given by the constitution, or by the laws of the United States.

"Courts which originate in the common law possess a jurisdiction which must be regulated by their common law, until some statute shall change their established principles; but courts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction. It is unnecessary to state the reasoning on which this opinion is founded, because it has been repeatedly given by this court; and with the decisions heretofore rendered on this point, no member of the bench has, even for an instant, been dissatisfied." *Ex parte Bollman*, 4 Cranch 75, 93.

[17] See *Harris* v. *Nelson*, 394 U. S. 286, 299.

[18] This Court has frequently considered this requirement in the context of orders necessary or appropriate in the exercise of appellate jurisdiction. See J. Moore, B. Ward, & J. Lucas, 9 Moore's Federal Practice ¶¶ 110.27–110.28 (1975). Here, we are faced with an order that must be necessary or appropriate in the exercise of a district court's original jurisdiction.

The Court starts from the premise that a district court may issue a writ under the Act "to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *Ante,* at 172. As stated, this premise is neither objectionable nor remarkable and conforms to the principle that the Act was intended to aid the court in the exercise of its jurisdiction. Clearly, if parties were free to ignore a court judgment or order, the court's ability to perform its duties would be undermined. And the court's power to issue an order requiring a party to carry out the terms of the original judgment is well settled. See *Root* v. *Woolworth,* 150 U. S. 401, 410–413. The courts have also recognized, however, that this power is subject to certain restraints. For instance, the relief granted by the writ may not be "of a different kind" or "on a different principle" from that accorded by the underlying order or judgment. See *id.,* at 411–412.[19]

---

[19] These restraints are necessary concomitants of the undisputed fact that the All Writs Act does not provide federal courts with an independent grant of jurisdiction. *McIntire* v. *Wood,* 7 Cranch 504; *Rosenbaum* v. *Bauer,* 120 U. S. 450. The factors mentioned above may be relevant in determining whether the court has ancillary jurisdiction over the dispute. See *Dugas* v. *American Surety Co.,* 300 U. S. 414; *Labette County Commr's* v. *Moulton,* 112 U. S. 217; *Morrow* v. *District of Columbia,* 135 U. S. App. D. C. 160, 417 F. 2d 728 (1969). In this case, the District Court's order was entered against a third party—the Telephone Company. The Court never explains on what basis the District Court had jurisdiction to enter this order. Possibly, the District Court believed that it had ancillary jurisdiction over the controversy, or that the failure of the Company to aid the Government posed a federal question under 28 U. S. C. § 1331. See *Board of Education* v. *York,* 429 F. 2d 66 (CA10 1970), cert. denied, 401 U. S. 954. Since I believe that the District Court could not enter its order in any event since it was not in aid of its jurisdiction, I do not find it necessary to reach the question whether there was jurisdiction, apart from the All Writs Act, over the "dispute" between the Government and the Telephone Company. However, the Court's failure to indicate the basis of jurisdiction is inexplicable.

More significantly, the courts have consistently recognized and applied the limitation that whatever action the court takes must be in aid of *its* duties and *its* jurisdiction.[20]  The fact that a party may be better able to effectuate its rights or duties if a writ is issued never has been, and under the language of the statute cannot be, a sufficient basis for issuance of the writ.  See *Sampson* v. *Murray,* 415 U. S. 61; *Commercial Security Bank* v. *Walker Bank & Trust Co.,* 456 F. 2d 1352 (CA10, 1972); J. Moore, B. Ward, & J. Lucas, 9 Moore's Federal Practice ¶ 110.29 (1975).

Nowhere in the Court's decision or in the decisions of the lower courts is there the slightest indication of why a writ is necessary or appropriate in this case to aid the District Court's jurisdiction.  According to the Court, the writ is necessary because the Company's refusal "threatened obstruc-

---

[20] The Court's failure to explain why the District Court's order was in aid of its jurisdiction is particularly notable when compared to the rationale of the prior Court cases on which it relies.  See, *e. g., Harris* v. *Nelson,* 394 U. S. 286, 299 ("the habeas corpus *jurisdiction and the duty to exercise it* being present, the courts may fashion appropriate modes of procedure . . . . *Where their duties require it,* this is the inescapable obligation of the courts") (emphasis added); *FTC* v. *Dean Foods Co.,* 384 U. S. 597, 604 (injunction issued under All Writs Act upheld because it was necessary "to preserve the *status quo* while administrative proceedings are in progress and *prevent impairment of the effective exercise of appellate jurisdiction*") (emphasis added).

The Court apparently concludes that there is no functional distinction between orders designed to enable a party to effectuate its rights and orders necessary to aid a court in the exercise of its jurisdiction. *Ante,* at 175 n. 23.  The Court reaches this conclusion by pointing out that the orders in cases such as *Harris* v. *Nelson, supra,* protected a party's rights. This is, of course, true.  Orders in aid of a court's jurisdiction will usually be beneficial to one of the parties before the court.  The converse, however, is clearly not true.  Not all orders that may enable a party to effectuate its rights aid the court in its exercise of jurisdiction. Compare *Sampson* v. *Murray,* 415 U. S. 61, with *FTC* v. *Dean Foods Co., supra.*

tion of an investigation . . . ." *Ante,* at 174. Concededly, citizen cooperation is always a desired element in any government investigation, and lack of cooperation may thwart such an investigation, even though it is legitimate and judicially sanctioned.[21] But unless the Court is of the opinion that the District Court's interest in its jurisdiction was coextensive with the Government's interest in a successful investigation, there is simply no basis for concluding that the inability of the Government to achieve the purposes for which it obtained the pen register order in any way detracted from or threatened the District Court's jurisdiction. Plainly, the District Court's jurisdiction does not ride on the Government's shoulders until successful completion of an electronic surveillance.

If the All Writs Act confers authority to order persons to aid the Government in the performance of its duties, and is no longer to be confined to orders which must be entered to enable the court to carry out its functions, it provides a sweeping grant of authority entirely without precedent in our Nation's history. Of course, there is precedent for such authority in the common law—the writ of assistance. The use of that writ by the judges appointed by King George III was one British practice that the Revolution was specifically intended to terminate. See n. 3, *supra.* I can understand why the Court today does not seek to support its holding by reference to that writ, but I cannot understand its disregard of the statutory requirement that the writ be "agreeable to the usages and principles of law."

---

[21] A citizen is not, however, free to forcibly prevent the execution of a search warrant. Title 18 U. S. C. § 2231 imposes criminal penalties on any person who "forcibly assaults, resists, opposes, prevents, impedes, intimidates, or interferes with any person authorized to serve or execute search warrants . . . ." This section was originally enacted as part of the Espionage Act of 1917, see n. 6, *supra,* and is the only statutory provision imposing any duty on the general citizenry to "assist" in the execution of a warrant.

## III

The order directed against the Company in this case is not particularly offensive. Indeed, the Company probably welcomes its defeat since it will make a normal profit out of compliance with orders of this kind in the future. Nevertheless, the order is deeply troubling as a portent of the powers that future courts may find lurking in the arcane language of Rule 41 and the All Writs Act.

I would affirm the judgment of the Court of Appeals.