Bernice SAMPLES, et al., Plaintiffs,

v.

CONOCO, INC.; Agrico Chemical Company; and Escambia Treating Company, Inc., Defendants.

No. 3:01–CV–149/LAC.

United States District Court, N.D. Florida.

Aug. 7, 2001.

J. Michael Papantonio, Neil D. Overholtz, Levin, Papantonio, Thomas, Pensacola, FL, for plaintiffs.

Donald H. Partington, Jesse W. Rigby, Clark, Partington, Hart, Pensacola, FL, J.W. Frost, II, Frost & Saunders, Bartow, FL, for defendants.

### ORDER GRANTING MOTION TO REMAND

COLLIER, District Judge.

THIS CAUSE comes before the Court on Plaintiffs' motion for remand and memorandum of law in support thereof (docs.19–20). Defendants timely filed a response (docs.24–25). For the reasons stated below, Plaintiffs' motion is GRANTED.

#### I. BACKGROUND

The history and events leading up to this lawsuit, well-publicized in the local media, need not be repeated here. Only minimal attention need be given to the factual background and procedural aspects of the case relevant to this Order.

On 15 February 1994, the United States, on behalf of the Environmental Protection Agency ("EPA"), filed a cost-recovery and cleanup action against Conoco, Inc. ("Conoco"), and Agrico Chemical Company ("Agrico") pursuant to the Comprehensive

Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), Pub.L. No. 96–510, 94 Stat. 2767 (codified as amended at 42 U.S.C. § 9601 *et seq.*). *See United States v. Agrico Chem. Co.*, No. 3:94–cv–30057/LAC, complaint (doc. 1) (N.D.Fla.). The Government filed suit to recover costs incurred by the EPA and the Department of Justice for response actions taken at the Agrico Chemical Company Superfund Site ("Agrico Chemical Site") located at the northwest corner of Fairfield Drive and Interstate 110 in Pensacola, Florida. The Government also sought to implement a remedial action for treatment of the contaminated soils located on the Agrico Chemical Site.

This Court entered a consent decree approving the EPA's selected remedial action on 3 May 1994.[1] *See id.* (consent decree (doc. 6)). In doing so, the Court retained jurisdiction over the lawsuit for the purpose of enabling any party to petition for any further relief necessary or appropriate for the construction or modification of the consent decree, to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with the dispute resolution clause. The consent decree was amended on 10 March 1997. *See id.* (amendment to consent decree (doc. 26)). This amendment approved a second remedial action designed to monitor groundwater conditions as natural attenuation, flushing and dispersion of contaminants from the Agrico Chemical Site occur.[2]

The EPA has also investigated Escambia Treating Company ("Escambia Treating").[3] As a result, the EPA initiated various enforcement, removal, and interim actions. In 1988, the United States, on behalf of the EPA, filed a complaint against Escambia Treating and nine additional parties seeking injunctive relief and penalties under the Resource Conservation and Recovery Act of 1976, Pub.L. No. 94–580, 90 Stat. 2795 (current version codified as amended in scattered sections of 42 U.S.C.). *See United States v. Escambia Treating Co.*, No. 3:88–cv–30328/RV, 1990 EPA Consent LEXIS 300, at *1 (N.D.Fla. Dec. 20, 1990). District Judge Roger Vinson entered a consent decree approving a settlement in that case on 20 December 1990.

In addition, the EPA excavated approximately 220,000 cubic yards of contaminat-

---

1. The major components of that remedy included: (1) excavation, solidification, and stabilization of approximately 32,500 cubic yards of contaminated sludge and soils from site sludge ponds, (2) consolidation of all stabilized sludge and soils into one sludge pond, (3) construction of a RCRA cap over the sludge pond, (4) construction of a slurry wall around the RCRA cap, and (5) implementation of institutional controls to include security fencing, access, and site deed restrictions. The contaminated soil is known as Operable Unit One ("OU–1"). Remedial activities associated with OU–1 were completed in April 1997 (doc. 25, Ex. B).

2. The contaminated groundwater is known as Operable Unit Two ("OU–2"). The major components of that remedy included: (1) monitoring the groundwater of the Sand–and–Gravel Aquifer, (2) monitoring the sur-

face water of Bayou Texar, (3) conducting door-to-door surveys of irrigation wells, (4) requesting access from private landowners to plug and abandon impacted irrigation wells, (5) implementing an advisory program, and (6) utilizing institutional controls to restrict new wells. The construction of remedial measures associated with OU–2 was completed in July 1999 (doc. 25, Ex. B).

3. Escambia Treating operated a wood-preserving facility in Pensacola from 1942 until its closing in 1982. It was administratively dissolved by the Florida Department of State in 1993. The property is located less than one-half mile to the northwest of the Agrico Chemical Site and is bordered on the north by residential neighborhoods, on the west by Palafox Street, on the east by a railroad switchyard, and on the south by an abandoned concrete plant and small industrial park.

ed soil between 1991 and 1992. The soil was piled up to form a large mound, which is known by many local residents as "Mount Dioxin." The mound is covered by a black tarp and held down with ropes and concrete weights. In 1994, the Escambia Treating Company Superfund Site ("Escambia Treating Site") was placed on the National Priorities List. *See* 40 C.F.R. pt. 300 app. B, at 210 (2000) (designated as "Escambia Wood–Pensacola"); National Priorities List for Uncontrolled Hazardous Waste Sites, 59 Fed.Reg. 65,206 (Dec. 16, 1994).

Between April and June 1995, the Agency for Toxic Substances and Disease Registry conducted a public health assessment. *See* Quarterly Public Health Assessments Completed, 60 Fed.Reg. 55,271 (Oct. 30, 1995). Due to concerns over potential health problems related to the Escambia Treating Site and Mount Dioxin, the EPA selected Escambia Treating as a pilot relocation site. *See* National Superfund Permanent Relocation Interim Policy, 64 Fed. Reg. 37,012 (July 8, 1999). This relocation pilot was used to provide guidance to EPA regional decision-makers on "when to consider permanent relocation of residents and businesses living near or on National Priorities List (NPL) sites as part of a Superfund remedial action." *Id.* "On February 12, 1997, a record of decision (ROD)

was issued for the permanent relocation of 358 households. The [EPA] made a decision to relocate the residences and clean up the properties to levels that are protective for industrial use." [4] *Id.* To date, the Government has not filed suit against any potentially responsible party to recover costs incurred by the EPA for response actions taken at the Escambia Treating Site.

On 23 March 2001, Plaintiffs filed this class-action lawsuit in state court against Conoco, Agrico, and Escambia Treating, alleging trespass (Count I), private nuisance (Count II), and strict liability (Count III).[5] Plaintiffs seek to recover damages, including restoration costs, allegedly arising from environmental contamination associated with the industrial facilities owned and operated by each defendant. On 16 April 2001, Defendants filed a notice of removal pursuant to 28 U.S.C. § 1446(a). Plaintiffs now move to remand. They argue this case should be remanded back to state court because the Court lacks subject matter jurisdiction over their lawsuit. Consequently, the Court must examine one of the most fundamental principles of law.

## II. Discussion

### A. Subject Matter Jurisdiction

Subject matter jurisdiction is the legal authority of a court to hear and decide a

---

4. Prior to filing this lawsuit, counsel for Plaintiff publicly questioned whether Conoco should have paid for the costs associated with relocating the 358 households (doc. 25, Ex. D: "This Week with Bob Solarski" Tr. at 20–21). Arguably, this comment infers that the EPA relocated the households due to health concerns associated with the Agrico Chemical Site and not the Escambia Treating Site. Clearly, the EPA decided to relocate households based on its investigation of Escambia Treating.

 The Court understands that this case is a high-profile case and will definitely receive public scrutiny by local residents and members of the media. In light of this fact, coun-

sel for both parties are strongly reminded that they have an ethical duty to refrain from making any extrajudicial statement, other than a quotation from or reference to public records, which violates the Local Rules of this Court or the Rules Regulating the Florida Bar. *See, e.g.,* N.D.Fla.Loc.R. 77.3(C); Fla. Rules of Prof'l Conduct R. 4–3.6.

5. For the sake of simplicity, the Court will hereinafter refer to Conoco and Agrico collectively as "Defendants." Even though Plaintiffs have provided proof of service to Escambia Treating's last known registered agent (doc. 51), that party has failed to formally make an appearance.

particular type of case. Federal courts have limited subject matter jurisdiction. They may exercise jurisdiction only if it is specifically authorized by Congress. For example, district courts of the United States have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C.A. § 1331 (West 1993). This statutory authority is commonly referred to as federal question jurisdiction. District courts also have original jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between" citizens of different states. *Id.* § 1332(a)(1) (West 1993 & Supp.2001). This provision is frequently referred to as diversity jurisdiction.

A civil action filed in state court may be removed to federal court by the defendant, so long as the federal court has original jurisdiction over the subject matter. *Id.* § 1441(a) (West 1994). Thus, a defendant can remove any civil action filed in state court provided federal question or diversity jurisdiction exists. If federal question jurisdiction exists, an action "shall be removable without regard to the citizenship or residence of the parties." *Id.* § 1441(b). If diversity jurisdiction exists, an action "shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." *Id.* "[A] plaintiff cannot defeat removal merely by naming a non-diverse defendant; that defendant also has to be 'properly joined and served' for removal to be barred." *Gilberg v. Stepan Co.,* 24 F.Supp.2d 325, 330 (D.N.J.1998).

### B. Analysis

Defendants maintain the Court can exercise jurisdiction over this case. First, they argue federal question jurisdiction exists because Plaintiffs' state-law claims arise under federal law. Second, they in-

sist the Court should exercise removal powers under the All Writs Act, 28 U.S.C. § 1651. Third, the Defendants claim diversity jurisdiction exists because the Plaintiffs have fraudulently joined Escambia Treating as a non-diverse defendant. Finally, they contend removal is appropriate solely to determine whether or not the complaint states a cause of action under section 4 of the Price–Anderson Act, which is incorporated into the Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et seq.*

### 1. Federal Question Jurisdiction

The well-pleaded complaint rule guides the determination of whether an action arises under federal law. Under this rule, a case may be removed based on federal question jurisdiction " 'only when the plaintiff's statement of his own cause of action shows that it is based' on federal law." *Blab T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.,* 182 F.3d 851, 854 (11th Cir.1999) (quoting *Louisville & Nashville R. Co. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908)). "[A] case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 14, 103 S.Ct. 2841, 2848, 77 L.Ed.2d 420 (1983). "In short, the plaintiff is the 'master of the claim' and may prevent removal by choosing not to plead an available federal claim." *Blab T.V.,* 182 F.3d at 854 (quoting *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987)).

If state law creates the cause of action, the case "might still 'arise under' the laws of the United States if a well-

pleaded complaint established that [the] right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Bd.*, 463 U.S. at 13, 103 S.Ct. at 2848. A case might also arise under the laws of the United States where federal law completely preempts the state-law claim. *See id.* at 24, 103 S.Ct. at 2854.

Without specifically addressing the well-pleaded complaint rule, Defendants argue federal question jurisdiction exists because Plaintiffs' lawsuit seeks to challenge the consent decree previously approved and amended by this Court. Stated somewhat differently, Defendants in essence argue Plaintiffs' state-law claims for trespass, private nuisance, and strict liability arise under federal law pursuant to either 28 U.S.C. § 1331, which provides federal question jurisdiction in general, or 42 U.S.C. § 9613, which provides exclusive original jurisdiction over any controversy arising under CERCLA.[6] Citing a line of authority from the Ninth Circuit Court of Appeals, Defendants contend § 9613(b) grants federal courts exclusive jurisdiction over claims created by CERCLA and any claim created by state or federal law related to the goals of a CERCLA cleanup. *See ARCO Envtl. Remediation, L.L.C. v. Dep't of Health & Envtl. Quality*, 213 F.3d 1108, 1115 (9th Cir.2000); *Fort Ord Toxics Project, Inc. v. Cal. Envtl. Prot. Agency*, 189 F.3d 828, 830–34 (9th Cir.1999); *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236, 239–40 (9th Cir.1995); *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 328–31 (9th Cir.1995).

Procedurally, the Court's inquiry remains the same when analyzing Plaintiffs' complaint under either section of the United States Code. *See ARCO*, 213 F.3d at

1113 (explaining the case did not fall within § 1331 or § 9613(b) because plaintiff's claims did not arise under federal law); *Gray v. Murphy Oil USA, Inc.*, 874 F.Supp. 748, 752 & n. 5 (S.D.Miss.1994) (stating "a claim for damages under CERCLA falls within the exclusive jurisdiction of the federal courts under both 42 U.S.C. § 9613 and 28 U.S.C. § 1331"). In order to invoke federal question jurisdiction, a cause of action must still arise under federal law.

Congress enacted CERCLA in 1980. It was designed to protect public health and the environment from dangers associated with reckless, negligent, and improper hazardous-waste-disposal practices. *See* H.R.Rep. No. 96–1016, at 17–18 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6119–20. With this goal in mind, Congress authorized the EPA to take "emergency assistance and containment actions" at inactive hazardous waste sites located throughout the United States. *Id.; see also* Comprehensive Environmental Response, Compensation, and Liability Act §§ 104–106, 94 Stat. at 2774–81. A "superfund" was established to finance such actions. *See id.* §§ 111, 221, 94 Stat. at 2788–92, 2801–02. Under the Act, the owner and operator of a facility became liable for all response costs incurred by the EPA, a state, or any other person regardless of fault. *See id.* § 107, 94 Stat. at 2781–85. Thus, CERCLA created a federal cause of action in strict liability to "recover necessary costs associated with the cleanup of hazardous waste from those responsible for creating such wastes." *Gray*, 874 F.Supp. at 752; *see also* Comprehensive Environmental Response, Compensation, and Liability Act §§ 108(c)–(d), 112, 94 Stat. at 2787, 2792–

---

**6.** Section 9613(b) states, in relevant part, that "the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter, without regard to the citizenship of the parties or the amount in controversy." 42 U.S.C.A. § 9613(b) (West 1995).

95 (explaining the procedure for presenting a claim to the fund for payment or commencing an action against the owner of a facility or the owner's guarantor). Federal district courts were granted exclusive jurisdiction over all controversies arising under CERCLA. *See id.* § 113(b), 94 Stat. at 2795. Notably, CERCLA did not preempt a state from imposing additional requirements or liabilities associated with the release of hazardous waste in that state, or affect or modify the obligations or liabilities of any person under other federal or state law with respect to the release of such waste. *See id.* §§ 114(a), 302(d), 94 Stat. at 2795–96, 2808.

Unfortunately, the problems associated with the release of hazardous waste were more extensive than originally reported. *See* H.R.REP. No. 99–253, at 54–56 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2836–38. Plus, CERCLA's enforcement provisions proved to be inefficient and, at times, ineffective. To combat those problems, Congress, after more than two years of inquiry and debate, amended CERCLA in 1986. *See* Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613 (codified as amended in scattered sections of 10, 26, & 42 U.S.C.). SARA was drafted "with the underlying belief that Congress should focus on ways to ensure rapid and [uninterrupted] cleanup of abandoned hazardous wastes." H.R.REP. No. 99–253, at 55, 1986 U.S.C.C.A.N. at 2837. Some of the more notable amendments empowered citizens to petition the EPA to perform health assessments, clarified the process for judicial review of decisions by the government, and granted citizens the right to sue any person or governmental body alleged to be in violation of any requirement under the Act. *See id.* at 58–59, 61, 72, 80–81, 85, 107–08, 139, 1986 U.S.C.C.A.N. at 2840–41, 2843, 2854, 2862–63, 2867, 2889–90, 2921; *see also* Superfund Amendments and Reauthorization Act §§ 105(b), 110, 113(c), 206, 326, 100 Stat. at 1626, 1638–39, 1649–50, 1704–05, 1755–57.

The pre-enforcement-review amendment received a significant amount of attention from Congress prior to enactment.[7] The purpose of this amendment, as initially proposed, was to "clarify the process for judicial review of government decisions on

7. Section 113(c) of SARA codified this amendment. It added subsection (h) to section 113 of CERCLA. Section 113(h) states:

**(h) Timing of Review**

*No Federal court shall have jurisdiction* under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) *to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:*

(1) An action under section 9607 of this title to recover response costs or damages or for contribution.

(2) An action to enforce an order issued under section 9606(a) of this title or to recover a penalty for violation of such order.

(3) An action for reimbursement under section 9606(b)(2) of this title.

(4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

(5) An action under section 9606 of this title in which the United States has moved to compel a remedial action.

42 U.S.C.A. § 9613(h) (emphasis added). The plain language of § 9613(h) prescribes that a federal court can *only* review such challenges or orders during one of the five enumerated actions. However, the word "challenges" is ambiguous. Therefore, the Court elects to examine legislative history for clarification.

the appropriate extent of remedy and liability of responsible parties." [8] *Superfund: Hearings Before the Subcomm. on Commerce, Transp., and Tourism of the Comm. on Energy and Commerce,* 99th Cong. 66 (1985) (prepared statement of Lee M. Thomas, EPA Administrator) [hereinafter *Superfund Hearings I* ]. The main concern was one of timing. Congress wanted to strike a balance between providing due process and obtaining rapid cleanups to protect public health and the environment. Pre-enforcement review of removal or remedial actions selected by the EPA, or pre-enforcement review of orders issued by the EPA would cause unnecessary delays and interference with a cleanup.

During a series of subcommittee and committee hearings held in 1985, members of Congress identified various actions and/or challenges the amendment was intended to cover. They are summarized as follows: (1) an action designed to review or contest the remedy selected by the EPA, prior to implementation, because (a) the remedy is inconsistent with the National Contingency Plan, (b) the remedy is not adequate, appropriate, or cost-effective, or (c) the remedy is excessive; (2) an action designed to obtain a court order directing the EPA to select a different remedy; (3) an action designed to delay, enjoin, or prevent the implementation of a remedy selected by the EPA; (4) an action designed to review or contest the liability of a potentially responsible party for response costs; (5) an action designed to litigate apportionment, contribution, or indemnification issues; or (6) an action de-

signed to litigate whether there has been a release of hazardous waste at the site. *See Superfund Reauthorization: Judicial and Legal Issues: Oversight Hearings Before the Subcomm. on Admin.Law and Gov't Relations of the Comm. on the Judiciary,* 99th Cong. 55–59 (1985) (statement of F. Henry Habicht II, Assistant Attorney General, Land and Natural Resources Division); *Superfund Improvement Act of 1985: Hearings on S. 51 Before the Comm. on the Judiciary,* 99th Cong. 37–38, 53–63, 79–81, 96–99 (1985) (statement of Henry Habicht; answers to questions by Sens. Simpson, Grassley and Hatch); *Reauthorization of Superfund: Hearings Before the Subcomm. on Water Res. of the Comm. on Pub. Works and Transp.,* 99th Cong. 645–46, 662–63, 719–25 (1985) (statement of Henry Habicht; answers to questions by Rep. Stangeland) [hereinafter *Superfund Hearings II* ]; *Superfund Hearings I, supra* at 29, 66, 156 (testimony and prepared statement of Lee M. Thomas, EPA Administrator; section-by-section analysis of proposed amendments). The hearings also revealed that one amendment in particular guaranteed due process. If a potentially responsible party were to form a good faith belief that it had valid grounds to challenge an EPA order, that party could either decline to comply with the order and get judicial review in an action brought by the EPA to enforce the order, or it could perform the cleanup under protest and then seek reimbursement of response costs from the fund. *See, e.g., Superfund Hearings II, supra* at 647–48, 712; *see also* 42 U.S.C .A. § 9606.

---

8. A secondary purpose of the amendment was to codify existing case law. *See, e.g., Lone Pine Steering Comm. v. United States Envtl. Prot. Agency,* 600 F.Supp. 1487, 1494–99 (D.N.J.1985) (explaining that pre-enforcement review would frustrate the goals of CERCLA); *Aminoil, Inc. v. United States,* 599 F.Supp. 69, 71 (C.D.Cal.1984) (explaining Congress did not intend to allow judicial review of administrative orders prior to an enforcement or recovery action under CERCLA); *United States v. Outboard Marine Corp.,* 104 F.R.D. 405, 410–11 (N.D.Ill.1984) (explaining judicial review of a record of decision is not permitted before the United States sues to recover its cleanup costs).

On 5 December 1985, the House of Representatives considered a compromise version of the pre-enforcement-review amendment. *See* 131 CONG.REC. 34,505, 34,645–47 (1985). It added a new section 113(h) to CERCLA. Subsections (h)(1) and (h)(2) reiterated the "ability of *affected parties* to obtain review of the [EPA's] selection of response actions when the government has instituted an action for cost recovery, an action to enforce an order under sections 104(b) or 106(a), or an action to recover penalties for the violation of such an order." *Id.* at 34,646 (emphasis added). These two paragraphs codified the existing case law that had addressed pre-enforcement review under CERCLA as originally enacted. *See id.; see also supra* note 8. Subsection (h)(3) provided the ability of *affected parties* to obtain review of an action when they petitioned for reimbursement of response costs under section 106(b)(2). *See* 131 CONG.REC. at 34,646. Subsection (h)(4) clarified "the right of *persons* to seek review of response actions" under section 310—SARA's citizen suit provision. *Id.* (emphasis added). Under subsection (h)(4), *persons* could only seek review of actions "taken" under section 104 or "secured" under section 106. *See id.* Moreover, the review would be confined to litigating whether the response action "taken" or "secured" violated any requirement under the Act. *See id.*

On 3 October 1986, the Committee of Conference recommended that both Houses should agree to various amendments made by the Committee to H.R.2005—the bill which was ultimately signed into law by President Ronald Reagan eleven days later. *See* H.R.CONF.REP. No. 99–962, at 1, 179, 221–24 (1986) (joint explanatory statement of the Committee of Conference), *reprinted in* LEXIS at SARA Leg.Hist. 38. The Committee clarified the language of section 113(h). *See id.* at 223–24. "It adopt[ed] the first three exceptions of both the Senate and House amendments, the

fourth exception of the House amendment and, with clarifications, the fifth exception of the House amendment." *Id.* Finally, and most importantly, the Committed stated that "[n]ew section 113(h) is not intended to affect in any way the rights of persons to bring nuisance actions under State law with respect to releases or threatened releases of hazardous substances, pollutants, or contaminants." *Id.* at 224.

The Senate agreed to House Conference Report 99–962. *See* 132 CONG.REC. 28,406, 28,456 (1986). However, Senators Stafford, Mitchell, and Thurmond wanted to provide further clarification. *See id.* at 28,406–12, 28,441. Senator Stafford, a member of the Conference Committee "who insisted upon stating expressly what all had agreed was their intent," provided additional insight "into the purpose and meaning of the provisions in section[ ] 113." *Id.* at 28,410. He explained:

> The time of review of judicial challenges to cleanups is governed by 113(h) for those suits to which it is applicable. It is not by any means applicable to all suits. For purposes of those based on State law, for example, 113(h) governs only those brought under State law which is applicable or relevant and appropriate as defined under section 121. *In no case is State nuisance law, whether public or private nuisance, affected by 113(h).*

*Id.* at 28,410 (emphasis added). Senator Mitchell, after noting the Committee agreed that some pre-implementation review should be provided, stated "[n]uisance suits would, of course, be permitted at any time." *Id.* at 28,429. Senator Thurmond presented his interpretation of section 113(h) and asked whether it conformed with the intention of the Committee. He stated:

> The timing of review section is intended to be comprehensive. It covers all

lawsuits, under any authority, concerning the response actions that are performed by EPA and other Federal agencies, by States pursuant to a cooperative agreement, and by private parties pursuant to an agreement with the Federal Government. The section also covers all issues that could be construed as a challenge to the response, and limits those challenges to the opportunities specifically set forth in the section.

.... [T]here is no jurisdiction to review a response action through a citizen suit except as provided in the timing of review section. Citizens, including potentially responsible parties, cannot seek review of the response action or their potential liability for a response action—other than in an action for contribution—unless the suit falls within one of the categories provided in this section.....

The reference in the introductory language of the timing of review section to the general jurisdictional provision 28 U.S.C. 1332 is designed with the sole purpose of ensuring that actions in State court under State law can continue to be brought in Federal court if diversity jurisdiction exists. Actions within the scope of diversity jurisdiction may include, for example, a private nuisance suit against a person in another State who is not otherwise acting pursuant to an agreement with the Federal or State government. Thus, this reference to 28 U.S.C. 1332 does not create any additional rights or opportunities to obtain review of a Superfund response action.

Similarly, the reference to "Federal court" is simply to recognize existing section 113(b) of CERCLA, which provides that except for review of regulations, Federal district courts have exclusive jurisdiction over all controversies under CERCLA. Therefore, any controversy over a response action selected by the President, whether it arises un-

der Federal law or State law, may be heard only in Federal court, and only under the circumstances provided in this section.

*Id.* at 28,441. The Chairman answered Senator Thurmond in the affirmative.

The House of Representatives also agreed to House Conference Report 99–962. However, some Representatives were disappointed with the statements made by Senators Stafford, Mitchell, and Thurmond without any opportunity for debate. *See* 132 CONG.REC. 29,714, 29,715, 29,735–37 (1986). Representative Glickman agreed almost verbatim with Senator Thurmond's interpretation of section 113(h), and added: "For aid in interpreting this legislation, one should rely on the legislative language itself, the statement of managers accompanying the language—which statement was agreed to by all of the conferees—and the relevant underlying legislative history ." *Id.* at 29,735–36. He disagreed with portions of Senator Stafford's discussion:

I am afraid he has also missed the point of the conference agreement in this section. Under this agreement, one cannot challenge the remedy selected by the President under the guise of a State nuisance law claim. Pursuant to section 113, Federal district courts have exclusive jurisdiction over all controversies under CERCLA. Therefore, any controversy over a response action selected by the President, whether it arises under Federal law or State law, may be heard only in Federal court, and only under the circumstances provided in this section.

.... Clearly the conferees did not intend to allow any plaintiff, whether the neighbor who is unhappy about the construction of a toxic waste incinerator in the neighborhood, or the potentially responsible party who will have to pay for

its construction, to stop a cleanup by what would undoubtedly be a prolonged legal battle. It was for this very reason that the conferees included section 113(h).

*On the other hand, section 113(h) does not affect the ability to bring nuisance actions under State law for remedies within the control of the State courts which do not conflict with the Superfund legislation. The language preserving State nuisance actions in a limited manner is intended to preserve the use of State enforcement authority to compel private party cleanup or to otherwise assure that the State or private party citizens can continue to abate nuisances resulting from hazardous waste disposal when such actions do not conflict with CERCLA.*

*Id.* at 29,737 (emphasis added). Thus, Representative Glickman agreed section 113(h) does not affect the rights of persons to bring nuisance actions under state law so long as the remedies do not conflict with CERCLA.

Discussions on section 113(h) continued until the day SARA was signed into law. Senator Dole stated:

One last issue strikes very close to home, and this is the issue of preemption. Two of my House colleagues argued that Superfund is a preemptive law. Nothing could be farther from the truth . . . . .

These House Members suggested that section 113(h) covers all lawsuits under the authority of any law, State or Federal, concerning the response actions that are performed by EPA and other Federal agencies, by States pursuant to cooperative agreements, and by private parties pursuant to an agreement with the Federal Government. Under this suggestion, section 113 would become preemptive in a way never contemplated or intended by the Congress, in any case

in which the executive branch took or endorsed [a] response action. Such a construction would be inconsistent with the evolution of the "preenforcement review" provisions, as well as the explicit language of the bill and Statement of Managers and of section 114(a) and 320(d) of existing law.

As passed by both the House and Senate, section 113(h) began as follows: No court shall have jurisdiction to review any challenges. \*\*\*

Because of a concern about the very result urged by my two House colleagues, the language was changed to read as follows:

No Federal court shall have jurisdiction under Federal law other than under section 1332 of title 28 of the United States Code (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 121 (relating to cleanup standards) to review any challenges. \*\*\*

An interpretation of the original text may have been to extinguish the jurisdiction of any court to review any challenge. Clearly, the conference substitute no longer does this. It limits the jurisdiction of specified courts to review challenges arising out of specified laws. The final language has become much more narrow and targeted. Clearly preserved, for example, are challenges to the selection or adequacy of remedies based on State nuisance law, or actions to abate the hazardous substance release itself, independent of Federal response action.

The conference language would permit a suit to lie in either Federal court— where jurisdiction could be based on diversity of citizenship—or in State court, where based on nuisance law. This construction is confirmed by the

statement of managers explanation that "New section 113(h) is not intended to affect in any way the rights of persons to bring nuisance actions under State law with respect to releases or threatened releases of hazardous substances, pollutants or contaminants."

Section 113 of CERCLA governs only claims arising under the act. Whether or not a challenge to a cleanup will lie under nuisance law is determined by that body of law, not section 113. *New subsection (h) governs only the suits filed under the circumstances enumerated in paragraphs (1) through (5) for the review of "challenges to removal or remedial action selected under section 104, or to review any order issued under 106(a)."* There is no support whatsoever in the original CERCLA law, in H.R.2005 as now signed by the President, or in the statement of managers for the proposition that "any controversy over a response action selected by the President, whether it arises under Federal law or State law, may be heard only in Federal court and only under circumstances provided" in section 113. That statement is contrary to the express legislative language and the statement of managers.

132 CONG.REC. 33,177, 33,554–55 (1986) (emphasis added).

■ Based on the legislative history, the Court holds section 113 governs only claims, controversies, or challenges arising under CERCLA. *See also Axel Johnson, Inc. v. Carroll Carolina Oil Co.,* 145 F.3d 660, 662 (4th Cir.1998); *State of Ala. v. United States Envtl. Prot. Agency,* 871 F.2d 1548, 1557–59 (11th Cir.1989). The

Court further holds subsection (h) does not affect the rights of persons to bring nuisance, trespass, or similar actions under state law for remedies within the control of state courts which do not conflict with CERCLA.[9] If an action constitutes a challenge to a response or remedial action under section 104, or if an action seeks review of an order issued under section 106(a), then federal courts lack jurisdiction over such actions unless they are filed under the circumstances enumerated in paragraphs (1) through (5) of section 113(h). The plain language of section 113(h) and the legislative history demand such a result. Furthermore, the Court declines to follow *ARCO, Fort Ord, Razore,* and *McClellan* to the extent they stand for the proposition that section 113 governs or confers exclusive jurisdiction over claims, controversies, or challenges that do not arise under CERCLA; to the extent they stand for the proposition that subsection (h) affects the rights of persons to bring nuisance, trespass, or similar actions under state law for remedies within the control of state courts which do not conflict with CERCLA; and to the extent they run afoul of legislative intent.

■ Plaintiffs' lawsuit does not constitute a "challenge" to the consent decree as that term is used in section 113(h) of CERCLA, 42 U.S.C. § 9613(h). The lawsuit is not an action designed to review or contest the remedy selected by the EPA, prior to implementation; it is not an action designed to obtain a court order directing the EPA to select a different remedy; it is not an action designed to delay, enjoin, or prevent the implementation of a

---

**9.** The Court agrees with Representative Glickman's assertion that "section 113(h) does not affect the ability to bring nuisance actions under State law for remedies within the control of the State courts which do not conflict with the Superfund legislation." 132 CONG. REC 29,714, 29,737 (1986). An obvious example of a nuisance action that conflicts with CERCLA would be one that states a claim or controversy arising under the Act. Another example would be one that in essence constitutes a challenge to a removal or remedial action as that term is used in section 113(h).

remedy selected by the EPA; and it is not a citizen suit brought pursuant to 42 U.S.C. § 9659.[10] *Cf. State of Ala.*, 871 F.2d at 1559 (explaining why a complaint challenged a remedial action). Under each count, Plaintiffs seek to recover damages for (1) the loss of use and enjoyment of property, (2) the loss of use of the groundwater, (3) the diminution in value of property, (4) restoration costs, (5) mental anguish, (6) pain and suffering, (7) consequential and incidental damages, (8) disgorgement of profits realized, and (9) unjust enrichment (doc. 1, Ex. 1 ¶¶ 1, 60, 65, 69).

Defendants' reliance on the allegations contained in Plaintiffs' complaint is misplaced. The complaint alleges:

35. Conoco and Agrico claim to have implemented a cleanup of the soil contamination caused by the operations at the Conoco/Agrico Facility. In reality, Conoco and Agrico have failed to clean up and remove the hazardous substances found in the soils at the Conoco/Agrico Facility. Instead, Conoco and Agrico have merely mixed the contaminated soils with clay and stored the hazardous mixture on-site by burying it underground.

36. Conoco and Agrico saved millions of dollars by storing the contaminated soil on-site instead of removing it and disposing of it at a permitted off-site hazardous waste disposal facility.

37. Conoco and Agrico also claim to have implemented a cleanup of the groundwater contamination caused by the operations of the Conoco/Agrico Facility. In reality, Conoco and Agrico have failed to remove the hazardous substances from the groundwater and have no apparent intent of doing so. Instead, Conoco and Agrico continue to allow the contaminated groundwater to

intrude on, under and around the property where plaintiffs reside and run their businesses.

38. Conoco and Agrico saved millions of dollars by leaving the contamination in the groundwater and allowing it to continue to intrude on, under and around plaintiffs' property and discharge into Bayou Texar.

(*Id.* ¶¶ 35–38). Indeed, these general-background allegations are somewhat inflammatory and allege Defendants failed to cleanup and remove the hazardous substances found in the soils of the Agrico Chemical Site and failed to remove the substances from the groundwater. But they do not constitute a challenge to the consent decree. They merely support Plaintiffs' state-law claims for trespass and private nuisance. To establish liability, Plaintiffs have the difficult burden of proving that hazardous substances have trespassed or intruded onto their property. The Court must presume the allegations are intended to support the elements of a trespass or nuisance claim. This presumption is supported by reading the complaint in its entirety. For example, Plaintiffs' complaint alleges:

44. The continuing migration on, under and around the plaintiffs' property, of the soil and groundwater contamination caused by defendants' actions and operations has impaired plaintiffs' ability to install and/or use irrigation wells on their property thereby permanently impairing the value of the plaintiffs' land.

45. The contamination caused by defendants' actions and operations has diminished the value of plaintiffs' properties and has impaired the ability to sell said properties.

46. The contamination caused by defendants' actions and operations has ren-

---

10. *See supra* discussion on the committee hearings summarizing the various actions and/or challenges section 113(h) was intended to cover.

dered the groundwater under plaintiffs' properties unfit for use and consumption as evidenced by defendant Conoco's request in October of 2000 that plaintiffs' abandon the water wells on their property and by the Northwest Florida Water Management District's moratorium on the installation of any new wells in the area impacted by the contamination.

(*Id.* ¶¶ 44–46). In addition, Plaintiffs' class-representation allegations only identify questions of fact and law relevant to establishing liability under their state-law claims (*Id.* ¶ 50). Finally, Counts I, II, and III allege additional facts which support the elements of each particular cause of action (*Id.* ¶¶ 55–69).

Defendants argue that Plaintiffs' request for restoration costs, in and of itself, constitutes a challenge to the consent decree. The Court disagrees.[11] As discussed earlier, section 113(h) does not affect a persons right to bring trespass or nuisance actions under state law for remedies within the control of state courts which do not conflict with CERCLA. Moreover, CERCLA does not "affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants." 42 U.S.C. § 9652(d).

■■■■ Under Florida law, "damages for the wrongful injury of property are measured either by the diminution in value or the costs of repairing or restoring the property to its condition prior to the injury." *Davey Compressor Co. v. City of Delray Beach*, 639 So.2d 595, 596 (Fla. 1994) (citing *United States Steel Corp. v.*

*Benefield*, 352 So.2d 892 (Fla. 2d DCA 1977)). "[W]here the cost of restoration is less than the diminution in value, the law generally requires that damages be measured by the cost of repairs or restoration." *Id.* (citing *Keyes Co. v. Shea*, 372 So.2d 493 (Fla. 4th DCA 1979)). However, "the cost of restoration 'cannot be adopted as the measure of damages where the cost of restoring the property would exceed the value thereof in its original condition, or the depreciation in the value thereof, or the actual damage sustained by plaintiff, or where restoration is impracticable.'" *Id.* (quoting 25 C.J.S. *Damages* § 84, at 924–26). "Restricting restoration costs to the value of the property is a means of preventing plaintiffs from being overcompensated or from receiving overlapping recovery." *Id.*

Florida courts have consistently held that the proper measure of damages sustained by *private landowners* for contamination of groundwater is the diminution in value of the property and not restoration costs. *See, e.g., Crown Cork & Seal Co. v. Vroom*, 480 So.2d 108, 109, 112 (Fla. 2d DCA 1985) (stating "we would not be persuaded that the cost of restoration would have been a fair and proper measure of damages in this private suit"); *Standard Oil Co. v. Dunagan*, 171 So.2d 622, 624 (Fla. 3d DCA 1965); *cf. Courtney Enters., Inc. v. Publix Super Mkts., Inc.*, 788 So.2d 1045, 1048 (Fla. 2d DCA 2001) (stating "the measure of damages under the common law in cases such as the instant one is either the diminution of value or the restoration costs, but not restoration costs that exceed the diminution in value of the property"). *But cf. Davey Compressor*, 639 So.2d at 595–97 (recognizing a limited,

---

**11.** The Defendants appear to take the extreme position that any request for relief, even a request for "such further relief as the court deems proper," constitutes a challenge to the consent decree. The Defendants also cite 42 U.S.C. § 9622(e)(6) in further support. This argument is without merit. Plaintiffs' lawsuit is not and action designed to force the Defendants to undertake a remedial action at the Agrico Chemical Site or the Escambia Treating Site. Plaintiffs merely seek damages for injuries to their property.

public policy exception to the rule). Clearly, under the law as it exists today, Plaintiffs seek remedies that are within the control of Florida state courts which do not conflict with CERCLA. *Cf. Beck v. Atl. Richfield Co.*, 62 F.3d 1240, 1243 (9th Cir.1995) (stating "resolution of the damages claim would not involve altering the terms of the cleanup order"). Plaintiffs, as private landowners, may only recover damages for diminution in value of their property or restoration costs. They cannot recover both. Nor can they recover restoration costs that exceed the diminution in value of the property.[12] For the reasons stated above, Plaintiffs' state-law claims for trespass, private nuisance, and strict liability do not arise under CERCLA.

Because Plaintiffs' complaint alleges state-law claims, federal question jurisdiction only exists if a substantial question of federal law is an essential component of each claim. Upon a review of Florida law, the Court concludes Plaintiffs' right to relief does not depend on the construction or application of the Constitution or laws of the United States. Besides, Plaintiffs' claims are not completely preempted by CERCLA, they are not based on a federal cause of action created by CERCLA, they are not brought under the circumstances enumerated in paragraphs (1) through (5) of section 113(h), and they seek remedies within the control of state courts which do not conflict with CERCLA. Consequently, the Court lacks federal question jurisdiction over Plaintiffs' lawsuit.[13]

### 2. All Writs Act

 The All Writs Act provides "[t]he Supreme Court and all courts estab-lished by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C.A. § 1651(a) (West 1994). The Act authorizes a federal court to "issue such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977). The power extends "to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." *Id.* at 174, 98 S.Ct. at 373. However, the All Writs Act does not furnish an independent basis for federal jurisdiction. *See Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368, 1379 (11th Cir.1998).

After careful review of the law and arguments of counsel, the Court declines to invoke the All Writs Act to support removal. This is not an exceptional case. The consent decree previously approved and amended by the Court retained jurisdiction to effectuate or enforce compliance with its terms, to resolve disputes in accordance with the dispute resolution clause, and to permit the parties to petition for any necessary or appropriate relief related to the construction or modification of the consent decree. The only relevant provision is the last one, which tracks the "necessary or appropriate" language in the All Writs Act. However, as previously dis-

---

**12.** Of course, the Court intimates no view as to what measure of damages should be used or whether Plaintiffs are entitled to any other damages.

**13.** As an aside, the Court notes that if it were to conclude Plaintiffs' lawsuit constitutes a challenge to the consent decree, then the Court would lack jurisdiction over the case because it was not brought pursuant to one of the five enumerated actions under section 113(h). *See State of Ala.*, 871 F.2d at 1558–59.

cussed, Plaintiffs' lawsuit is not designed to modify or frustrate the implementation of the consent decree.

### 3. Diversity Jurisdiction

■ Plaintiffs, in addition to Conoco and Agrico, have also sued Escambia Treating—a non-diverse defendant. Plaintiffs joined Escambia Treating to this lawsuit because studies show that plumes of underground contamination from the Escambia Treating Site and the Agrico Chemical Site have merged together (doc. 1, Ex. 1 ¶ 42–43). Thus, diversity jurisdiction only exists if Escambia Treating was not properly joined as a defendant. As the removing parties, the burden to establish fraudulent joinder rests on the Defendants. *See Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440 (11th Cir.1983), *superceded by statute on other grounds by Wilson v. Gen. Motors Corp.*, 888 F.2d 779, 782 n. 3 (11th Cir.1989). Defendants "must show either that there is no possibility that the plaintiff would be able to establish a cause of action against the resident defendant in state court or that there has been an outright fraud in the plaintiff's pleading of jurisdictional facts." *Id.*

■ A district court "must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff." *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997). This determination is based on the plaintiff's pleadings at the time of removal. *See id.* However, the court "may consider affidavits and deposition transcripts submitted by the parties." *Id.* "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." *Coker*, 709 F.2d at 1440–41.

■ Initially, the Court notes the Defendants have not disputed the fact that Plaintiffs have a colorable claim against Escambia Treating. Citing *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1291 (11th Cir.1998), the Defendants argue Plaintiffs fraudulently joined Escambia Treating because they do not intend to pursue a judgment against that party. In support of this argument, Defendants refer the Court to various documents demonstrating that Escambia Treating has been defunct for eight years, has no assets, has not operated for sixteen years, has no living corporate officers, and has over $291,000 in unsatisfied judgments entered against it. Hence, Defendants argue Plaintiffs have sued a judgment-proof entity solely to defeat diversity jurisdiction. Plaintiffs, on the other hand, contend that their motivation for joining Escambia Treating is irrelevant as long as they intend to obtain a judgement against that defendant.

Undisputably, Florida law permits an aggrieved party to sue a dissolved corporation. *See* Fla.Stat.Ann. § 607.1405(2)(e) (West 2001); *Ron's Quality Towing, Inc. v. Southeastern Bank of Florida*, 765 So.2d 134, 135 (Fla. 1st DCA 2000). The question the Court must resolve is whether the fraudulent-joinder doctrine merely requires an intention to *obtain* a judgment against a defendant or whether it actually requires an intention to *collect* on a judgment.

In *Triggs*, the Eleventh Circuit stated: "Supreme Court precedent is clear that a plaintiff's motivation for joining a defendant is not important *as long as the plaintiff has the intent to pursue a judgment against the defendant.*" 154 F.3d at 1291 (emphasis added). As Plaintiffs point out, the Defendants apparently confuse the distinction between an intention to pursue or obtain a judgment versus an intention to

collect on a judgment. All that is required is a real intention to obtain a judgment against the non-diverse defendant as long as the potential for joint liability exists. As noted by the Supreme Court:

> [T]he motive of the plaintiff, taken by itself, does not affect the right to remove. If there is a joint liability, he has an absolute right to enforce it, whatever the reason that makes him wish to assert the right. Hence, the fact that the company is rich and [the employee] poor does not affect the case.
>
> ... *On the question of removal we have not to consider more than whether there was a real intention to get a joint judgment and whether there was a colorable ground for it shown as the record stood when the removal was denied.*

*Chicago Rock Island & Pac. Ry. Co. v. Schwyhart,* 227 U.S. 184, 193–94, 33 S.Ct. 250, 251, 57 L.Ed. 473 (1913) (citation omitted and emphasis added); *accord Chicago Rock Island & Pac. Ry. Co. v. Dowell,* 229 U.S. 102, 113–14, 33 S.Ct. 684, 686, 57 L.Ed. 1090 (1913).

When viewed in a light most favorable to the Plaintiffs, the Court cannot say Plaintiffs fraudulently joined Escambia Treating. As master of the complaint, Plaintiffs have every right to pursue a joint judgment against Conoco, Agrico, and Escambia Treating. A contrary result would violate the text and spirit of the fraudulent-joinder doctrine. So long as Plaintiffs' complaint states a cause of action against Escambia Treating, and so long as Plain-

tiffs intend to obtain a judgment against Escambia Treating, the Plaintiffs have a right to select the forum, to elect whether to sue joint tortfeasors, and to prosecute their own suit in their own way to a final determination.[14] *See Crowe,* 113 F.3d at 1538; *see also Storr Office Supply Div. v. Radar Bus. Sys.,* 832 F.Supp. 154, 157 (E.D.N.C.1993) (permitting a plaintiff to maintain an action in state court against a non-diverse, dissolved corporation); *Delatte v. Zurich Ins. Co.,* 683 F.Supp. 1062, 1063–64 (M.D.La.1988) (same); *Oliver v. Am. Motors Corp.,* 616 F.Supp. 714, 716–17 (E.D.Va.1985) (same); *Nosonowitz v. Allegheny Beverage Corp.,* 463 F.Supp. 162, 164 (S.D.N.Y.1978) (same). Accordingly, the Court lacks diversity jurisdiction over Plaintiffs' lawsuit.

### 4. Price–Anderson Act

In a final attempt to support removal, Defendants argue the Court has original jurisdiction over this case because Plaintiffs' lawsuit is a "public liability action" as that term is defined under section 4 of the Price–Anderson Act ("PAA"), 42 U.S.C. § 2210(n)(2). They claim this is a public liability action because Plaintiffs' complaint seeks to recover damages for injuries "arising out of or resulting from a nuclear incident."[15] 42 U.S.C.A. § 2014(w), (hh) (West 1994). The Defendants are adamant that the clear language of the PAA covers *any* claim of injury to property allegedly caused by certain nuclear material.[16] Astonishingly, Defendants

---

**14.** Assuming liability is ultimately established, the Defendants will be able to place Escambia Treating on the verdict form and argue their liability to the jury. *See* Fla.Stat.Ann. § 768.81 (West Supp.2001); *Fabre v. Marin,* 623 So.2d 1182 (Fla.1993), *overruled on other grounds by Wells v. Tallahassee Mem'l Reg'l Med. Ctr., Inc.,* 659 So.2d 249 (Fla.1995). Under this authority, a jury may assign a percentage of fault to Escambia Treating.

**15.** "The term 'nuclear incident' means any occurrence, including an extraordinary nuclear occurrence, within the United States causing ... bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C.A. § 2014(q).

**16.** The alleged "nuclear material" in this case

maintain that Congress did not limit the scope of the PAA's "public liability" provisions to Nuclear Regulatory Commission ("NRC") licensees and Department of Energy ("DOE") contractors. They do not directly support this proposition with case law (doc. 24 at 20–21 & n. 25). They merely opine that Congress used "sweepingly broad language, expressly covering any occurrence causing" damage to property.

Hogwash! This argument is frivolous. The Defendants should know the PAA only applies to the nuclear energy and weapons industries. Interestingly, the Fifth Circuit recently clarified this point in a case in which Conoco was a party. The appellate court stated: "The Price Anderson Act sets up an indemnification and limitation of liability scheme for public liability arising out of the conduct of the *nuclear energy and weapons industries.*" *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir.) (emphasis added), *cert. denied*, 530 U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000); *see also El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 476–77, 119 S.Ct. 1430, 1433–34, 143 L.Ed.2d 635 (1999); *Kennedy v. S. Cal. Edison Co.*, 219 F.3d 988, 993 (9th Cir.2000); *In re TMI Litig.*, 193 F.3d 613, 624–25 & n. 7 (3d Cir.1999); *Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1306 (11th Cir.1998). Furthermore, the word "occurrence" as used in the definition of "nuclear incident" means "that event at the site of the *licensed activity, or activity for which the Commission has entered into a contract,* which may cause damage." S.Rep. No. 296, at 16 (1957) (emphasis added), *quoted in* 10 C.F.R. § 8.2, at 202 (2001). And finally, Dan Berkovitz, an attorney with the Office of General Counsel, U.S. Nuclear Regulatory Commission, explained:

The Price–Anderson Act ... governs liability and compensation in the event of a "nuclear incident" arising from activities of Nuclear Regulatory Commission ("NRC") licensees and Department of Energy ("DOE") contractors. The coverage for NRC licensees encompasses activities of commercial nuclear power plants, certain fuel fabrication facilities, and non-DOE reactors used for educational and research purposes. Activities of DOE contractors are covered if they involve "the risk of public liability for a substantial nuclear incident." These contractor activities include nuclear weapons research, development and testing, nuclear energy research and development, and nuclear waste activities. The Act specifies the procedures for determining the amount and sources of compensation available to compensate persons injured as a result of a nuclear incident arising from these activities.

Dan M. Berkovitz, *Price–Anderson Act: Model Compensation Legislation?—The Sixty–Three Million Dollar Question,* 13 Harv.Envtl.L.Rev. 1, 1–2 (1989) (footnotes omitted); *see also id.* at 3–7; John F. McNett, *Nuclear Indemnity for Government Contractors under the Price–Anderson Act: 1988 Amendments,* 19 Pub. Cont.L.J. 1, 1–3 (1989).

The Defendants have failed to provide the Court with proof demonstrating they are a DOE contractor or an NRC licensee. Therefore, Plaintiffs' lawsuit does not state a cause of action under the PAA. The citizens of Pensacola can rest assured;

is uranium. Plaintiffs listed this material as one of the hazardous substances found in the sludge ponds on the Agrico Chemical Site (doc. 1, Ex. 1 ¶ 22). Plaintiffs also alleged that the contaminated groundwater plume contains radium–226 and radium–228 (*Id.*

¶ 34). Radium–226 and Radium–228 are decay products of uranium. Under the PAA, the term "source material" includes uranium or any ore containing uranium. *See* 42 U.S.C.A. § 2014(z); 10 C.F.R. § 20.1003 (2001). There lies the ostensible connection.

there has not been a nuclear incident at the Agrico Chemical Site.

### III. SUMMARY

In conclusion, Plaintiffs' state-law claims for trespass, private nuisance, and strict liability do not arise under CERCLA. Because this is not an exceptional case, the Court declines to invoke the All Writs Act to support removal. Plaintiffs have not fraudulently joined Escambia Treating to this case. Therefore, complete diversity does not exist. Finally, Plaintiffs' complaint does not state a cause of action under the Price–Anderson Act. For all of the reasons stated above, this Court lacks subject matter jurisdiction over Plaintiffs' lawsuit. Plaintiffs' motion for remand is GRANTED. The Court hereby remands this case to state court pursuant to 28 U.S.C. § 1447(c) and (d).

The Court's ruling in this matter may be summarized as follows, and IT IS HEREBY ORDERED:

1. Plaintiffs' motion for remand (doc. 19) is **GRANTED**. The above titled action is **REMANDED** to the Circuit Court in and for Escambia County, Florida.

2. Plaintiffs' motion to request hearing date for remand proceedings (doc. 23) is **DENIED**.

3. The Clerk of Court is directed to send a certified copy of this Order to the Clerk of the Circuit Court in and for Escambia County, Florida. *See* 28 U.S.C.A. § 1447(c) (West Supp. 2001).

4. Plaintiffs are awarded just costs and any actual expenses, including attorney fees, incurred as a result of the removal to the extent it was based on the Price–Anderson Act. *See id.*

Plaintiffs are only awarded costs, expenses, and fees related to that Act.