**UNITED STATES of America; Wayne County Department of Health, Air Pollution Control Division, Plaintiffs,**

**United States Army Corps of Engineers, Appellant,**

v.

**CITY OF DETROIT;  et al.,**

City of Detroit;  State of Michigan;  Macomb County;  Oakland County;  Wayne County, Defendants–Appellees.

No. 01–1277.

United States Court of Appeals, Sixth Circuit.

Jan. 11, 2002.

Keith, Circuit Judge, filed dissenting opinion.

Before KEITH, NORRIS, and BATCHELDER, Circuit Judges.

OPINION

NORRIS, Circuit Judge.

The district court in this case issued an order under the All Writs Act, 28 U.S.C. § 1651(a), directing the United States Army Corps of Engineers ("Corps") to accept dredged material in order to prevent the frustration of a consent judgment designed to address water pollution problems in and around Detroit. For the rea-

sons that follow, we vacate the order of the district court.

I.

In 1977, the United States brought suit against the City of Detroit, the Detroit Water and Sewerage Department (hereinafter the city and department will be referred to jointly as "Detroit"), and the State of Michigan, alleging that the Detroit wastewater treatment system was operating in violation of the Clean Water Act, 33 U.S.C. §§ 1251–1387, and its National Pollutant Discharge Elimination System ("NPDES") permit. That year, the parties signed a consent judgment setting a schedule to bring the treatment plant into compliance. Detroit's failure to comply led to a party-negotiated amended consent judgment in 1981 which contained a revised compliance schedule.

The State revised the NPDES permit in July 1997, and the city fell out of compliance. In 1998, the State issued a notice of violation to Detroit, which then entered into negotiations for a proposed administrative consent order. In August 2000, Detroit and the State negotiated a Second Amended Consent Judgment, which was approved by the district court, to bring Detroit into compliance.[1] This is the order at issue in the instant case. Among other things, the order required Detroit to dredge and dispose of 146,000 cubic yards of sediment from Conner Creek, a channel connected to the Detroit River. Discharges from Detroit's sewage treatment plant had contaminated the creek. Under the agreement, this dredging was to be completed "as soon as possible," and definitely before the completion of a Combined Sewer Overflow basin that Detroit was building in the vicinity. The sediment was to be disposed of "in accordance with state

1. Wayne, Oakland, and Macomb Counties were also parties to the consent judgment.

and federal requirements." The United States Environmental Protection Agency ("EPA") refused to participate in the negotiation of the agreement, explaining that it had not been part of the administrative proceedings.

Detroit had been planning to dredge Conner Creek before the project was added as a requirement in the consent judgment. In 1998, it had asked the Corps if it could dispose of the sediment at the Confined Disposal Facility ("CDF") at Pointe Mouillee, which is a wetlands area on the western shore of Lake Erie. Pointe Mouillee, operated by the Corps on bottomland owned by Michigan, includes a state game area and a 3.5–mile dike built to contain dredged material from the Detroit and Rouge Rivers. The Confined Disposal Facility, which has a capacity of 18,600,000 cubic yards, was constructed in 1981 under the authority of a statute on soil disposal facilities, 33 U.S.C. § 1293a.

The Corps at this point refused to accept the Conner Creek sediment, citing the elevated concentrations of lead and cadmium in the material. Detroit next explored the idea of dewatering the dredged sediment at the edge of the creek and then transporting the sediment to a landfill. Vigorous community opposition to the prospect of a malodorous dewatering along the creek led Detroit to table this plan. Detroit then returned to the Corps and suggested putting the sediment in a containment cell at the Pointe Mouillee facility; the cell would be covered with clean material to prevent contamination of the environment. The Corps expressed concern over the level of contaminants but agreed to work with Detroit and Michigan to find a solution. Negotiations ensued. The Corps requested and received Michigan's approval for the use of Pointe Mouillee for the sediment. The Corps then required Michigan to obtain the approval of the United States EPA and the United States Fish and Wildlife Service and to agree to hold the federal government harmless from liability arising out of the Conner Creek disposal. The Corps also insisted upon an Environmental Assessment to determine whether the disposal would comply with National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332 et. seq., requirements. The Corps also directed Detroit to obtain a dredging permit, a permit already required by the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403. Michigan responded to the Corps' demands by refusing to obtain the concurrence of either EPA or the Fish and Wildlife Service on the ground that these approvals would take too much time.

*Combined Sewer Overflow Basin*

In the meantime, Detroit agreed to undertake another project that became linked to the dredging—the construction of a thirty-million gallon settling basin at Conner Creek to contain the combined sewer overflow ("CSO") from industrial and sanitary sewage and stormwater runoff. The basin was required by Detroit's NPDES permit for its sewage treatment plan. Under the state-issued permit. Detroit was to begin construction of the basin by January 1, 2001, and to complete it by January 1, 2005. The high cost of the project prompted Detroit to apply to the State Revolving Loan Fund, which required a project description and environmental studies. When Detroit presented its basin project description, the State required that Detroit include in the proposal its plans for the Conner Creek dredging (even though the dredging is not being funded by the state revolving fund, and Detroit maintained that the two projects were separate). In other words, Detroit could not get funding for the basin unless it had secured a place to put its Conner Creek sludge. The city claimed that, if it

did the basin project without state funding, there would be an additional cost to ratepayers of $40,000,000. Thus the time pressure invoked by the State and Detroit in the instant motion to compel the Corps' acceptance of the sediment stems from the state-issued NPDES permit requiring Detroit to commence building the basin by January 1, 2001.[2]

*District Court Order*

On October 12, 2000, Michigan and Detroit filed a motion seeking an order to show cause why the Corps should not be ordered to accept the Conner Creek sediment. The district court concluded that the Corps was frustrating the August 2000 consent judgment, and it issued an order that "[t]he ACE [Army Corps of Engineers] accept dredged materials from Conner Creek for disposal at the Pointe Mouillee Confined Disposal Facility." *United States v. Michigan,* 122 F.Supp.2d 785, 793 (E.D.Mich.2000). The court continued by rejecting the Corps' conditions on the acceptance of the sediment:

> I find that, pursuant to the Agreement Between the United States of America and the State of Michigan Acting Through the Michigan State Department of Natural Resources for Local Cooperation at Detroit and Rouge Rivers, Michigan, dated May 10, 1974, the ACE has obtained from the State of Michigan the statutorily required liability protection language to which it is entitled under Section 123 of the River and Harbor Act of 1970, 33 U.S.C. § 1293a, and I ORDER that no further liability protection language from the State of Michigan is required or authorized by law.
>
> Since I find that the proposed disposal at the Pointe Mouillee CDF [Confined Disposal Facility] of dredged materials from Conner Creek does not constitute a new use of the facility, I ORDER that it

is not necessary that the ACE conduct a review of such disposal under the National Environmental Policy Act, or have developed a new EIS [Environmental Impact Statement] or EA [Environmental Assessment] by NEPA.

*Id.* at 793–94 (paragraph numbers omitted). The "new use" issue related to the Corps' assertion that the CDF had been used previously for "navigational dredging" and the Conner Creek sludge was "environmental dredging," a new use prompting a need for supplemental environmental studies. The district court denied a Corps motion for reconsideration, and the Corps appeals.

**II.**

### A. Standard of Review

"A district court's decision to grant or deny a permanent injunction is reviewed under several distinct standards. Factual findings are reviewed under the clearly erroneous standard, legal conclusions are reviewed *de novo,* and the scope of injunctive relief is reviewed for an abuse of discretion." *South Cent. Power Co. v. Int'l Bhd. Elec. Workers,* 186 F.3d 733, 737 (6th Cir.1999) (citation omitted); *see also Assoc. for Retarded Citizens of Conn., Inc. v. Thorne,* 30 F.3d 367, 369 (2d Cir.1994) (reviewing an All Writs Act joinder order for abuse of discretion). We are presented with the questions of whether the Corps is protected by sovereign immunity and whether the All Writs Act applies to nonparties, questions of law that we review *de novo.*

### B. Sovereign Immunity

■ The parties dispute the applicability of the waiver of sovereign immunity codified in the Administrative Procedures Act ("APA"), 5 U.S.C. § 702. Sovereign

---

**2.** The record before us is unclear on whether basin construction has begun.

immunity renders the United States immune from suit except when it has consented to be sued. *See Hercules, Inc. v. United States*, 516 U.S. 417, 422, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996). The APA, which waives the government's immunity for nonmonetary claims, provides, in relevant part:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States ... *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.

5 U.S.C. § 702.[3]

■ Detroit and Michigan claim that the APA's waiver of sovereign immunity is a general waiver applying to all suits for declaratory, injunctive, or mandamus relief, and is not limited to suits brought under the APA. The Corps contends instead that such waiver applies only when the court reviews a complaint filed under the APA. The Corps identifies two problems: 1) Detroit and Michigan did not file an APA complaint (instead filing a motion for an order to show cause); and 2) the district court did not review the agency inaction under the APA. Instead it relied on the All Writs Act, and it did not make a finding of wrongdoing by the Corps, which would have been necessary for an APA claim. *See* 5 U.S.C. § 706. The Corps

argues that its understanding of the waiver provision is supported by statutory structure since the waiver was inserted into the APA rather than as an independent provision of the United States Code. In addition, the Corps invokes the principle that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (citation omitted).

■ This circuit has not adopted the Corps' restrictive view of the § 702 waiver of sovereign immunity and has applied the waiver in cases brought under statutes other than the APA. *See A.E. Finley & Assocs., Inc. v. United States*, 898 F.2d 1165, 1167 (6th Cir.1990) ("the Administrative Procedure Act, specifically 5 U.S.C. § 702, waives sovereign immunity under § 1331"; case arising under the Contract Disputes Act); *Newsom v. Vanderbilt Univ.*, 653 F.2d 1100, 1107 (6th Cir.1981) (applying the APA waiver to a claim brought under the Hill–Burton Act on free hospital care); *see also Chamber of Commerce of United States v. Reich*, 74 F.3d 1322, 1328 (D.C.Cir.1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not"); *United States v. Mitchell*, 463 U.S. 206, 227 n. 32, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (stating in dicta that with the APA "Congress enacted a general consent to such suits [for declaratory, injunctive or mandamus relief].").  The filing of a motion rather than a complaint does not automatically preclude a waiver of sovereign immunity. Since the motion in the instant case did not seek monetary damages, it

---

**3.** The APA waiver of sovereign immunity does not apply to cases in which "statutes preclude judicial review," or where a matter has been committed to agency discretion by law. 5 U.S.C. § 701(a)(1)-(2). Judicial review is available for "[a]gency action made reviewa-

ble by statute and final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and applies "[e]xcept to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law." 5 U.S.C. § 703.

provides a proper basis for the application of the APA waiver.

### C. All Writs Act Authority Over the Corps

■ The parties dispute whether the court can issue an order against the Corps, a nonparty, under the All Writs Act. The All Writs Act provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

The Corps contends that the All Writs Act may be used only to enforce "legal obligations imposed by statute or some other independent source of law." Here, it argues, there are no independent legal obligations, and the court cannot enforce the consent judgment against it because it was not a party to the judgment. Detroit and Michigan defend the court's authority with alternative arguments. First, they suggest two statutes as a basis for compelling the Corps to act: a requirement under the spoil disposal facility law that the government allow permittees to use a spoil disposal facility (e.g., the CDF at Pointe Mouillee), 33 U.S.C. § 1293a(g), and the APA's requirements on timely agency action. 5 U.S.C. § 706.[4] In the alternative, they argue that there was authority for the All Writs Act order because an obligation binding the Corps is unnecessary under *United States v. New York Telephone*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), which held that a court can issue an order against a party frustrating the implementation of a court order. *Id.* at 174, 98 S.Ct. 364. The district court in the instant case did not rely on independent obligations in issuing its All Writs Act order but instead premised its authority on the enforcement of the consent judgment and the precedent of *New York Telephone*. For this reason, Detroit and Michigan's argument based on the statutory obligations is unavailing. We must decide if the consent judgment is sufficient to ground the court's order against the Corps under *New York Telephone*.

In *New York Telephone*, a district court had determined that probable cause existed to justify the use of a pen register (a device to record telephone numbers that are dialed) in a criminal investigation, and it had ordered the local telephone company to assist the FBI. The telephone company refused to cooperate fully because of its concern that a pen register qualified as a wiretap, which would trigger stringent procedural requirements that were not followed. *Id.* at 163, 98 S.Ct. 364. The court, ruling that pen registers were not wiretaps, then issued an All Writs Act order directing the phone company to comply with the previously issued order. The Supreme Court affirmed:

> The power conferred by the [All Writs] Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice.

*Id.* at 174, 98 S.Ct. 364 (citations omitted). The Court reasoned that there was no way the FBI could have accomplished its court-authorized surveillance without the compa-

---

4. The statute governing the construction of spoil disposal facilities provides that "[a]ny spoil disposal facilities constructed under the provisions of this section shall be made available to Federal licensees or permittees upon payment of an appropriate charge for such use." 33 U.S.C. § 1293a(g). The APA provides that a "reviewing court shall ... compel agency action unlawfully withheld or unreasonably delayed." *See* 5 U.S.C. § 706(1).

ny's cooperation; the phone company (a public utility with a "duty to serve the public") was not far removed from the controversy because its facilities were being used in a crime; and the assistance required was not "in any way burdensome." *Id.* at 174–75, 98 S.Ct. 364.

According to the Corps, *New York Telephone* does not govern in the instant case because the enforcement of a consent judgment is different from the enforcement of the court order in *New York Telephone.* The Corps cites the Court of Appeals for the Second Circuit, which has explained why a consent judgment is not a legal obligation authorizing the court to impose or enforce obligations on nonparties:

> where a district court enters a privately-negotiated consent decree, it does not determine that the obligations assumed by the parties are required by law. Indeed, consent decrees often impose rights and obligations greater than those required by law. Because the terms of the consent decree were voluntarily assumed rather than legally imposed, there is no basis for extending the negotiated outcome to a nonparty. While a district court has authority to enforce a judicially-approved consent decree against the parties to it, a district court that enforces the decree against a nonparty acts beyond its jurisdiction and thus beyond the scope of the All Writs Act.

*Thorne,* 30 F.3d at 370 (citation omitted).

In the instant case, the consent judgment was negotiated by the parties, the obligations were not determined in an adjudication on the merits, and the United States was not a party to the judgment. The urgency of the situation stems from the deadlines negotiated by Detroit and Michigan, and it is not clear to us that alternatives to immediate Corps acceptance were unavailable. We agree with the Corps that *New York Telephone* does not control this case, and the district court lacked authority to enforce a consent agreement against a nonparty.

## III.

For the foregoing reasons, the order of the district court is vacated.

KEITH, dissenting.

I agree with the majority's holding with respect to the sovereign immunity issue. Because I believe that the district court had the authority to order the Army Corps of Engineers to accept dredged materials from Conner Creek, and did not abuse his discretion in issuing the injunction, I respectfully dissent.

*Authority Under the All Writs Act*

The All Writs Act states that: "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The majority cites Supreme Court precedent holding that: "[t]he power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *United States v. New York Telephone Co.,* 434 U.S. 159, 174, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977).

Relying on a Second Circuit case, *Assoc. for Retarded Citizens of Conn., Inc. v. Thorne,* 30 F.3d 367, 369 (2d Cir.1994), the majority then finds that *New York Telephone* only allows court orders to be enforced against a nonparty, not consent judgments. Presumably, court orders de-

termine obligations required by law while obligations created by consent judgments are only "voluntarily assumed rather than legally imposed." The majority then holds that the district court exceeded its authority by enforcing a consent judgment against the United States Army Corps of Engineers—a nonparty.

However, I believe that the majority, with its reliance on *Thorne,* misreads the All Writs Act. Sometimes, court orders impose obligations pursuant to law and sometimes they impose obligations pursuant to private contract. Similarly, consent judgments may impose obligations pursuant to law or pursuant to private contract. The All Writs Act only speaks of this Court's ability to enforce its "jurisdiction" and "law", not private contract. Here, the district court issued a writ to ensure that the law, not a private contract, would not be violated by a public institution. Therefore, the All Writs Act allowed the district court to order the Army Corp of Engineers, a non-party, to accept the waste materials.

First, the majority grants too much power to the word "order". Certainly, if a court order is issued to enforce a private contract, the reasoning from *Thorne* would be persuasive. The "voluntarily" assumed obligations of a private contract are usually not required by law. Therefore, it would seem inequitable to allow a federal court to impose obligations on a non-party, who in no way involved themselves in the process that generated the contract. The same can be said about consent judgments entered into to enforce private contracts.

However, a court order issued to enforce the law has different consequences. While a person or organization may not have been a party to the underlying lawsuit, as resident of that jurisdiction, they are still part of the process that makes those laws and are governed by them. Therefore, it is reasonable to prevent them from "frustrating" the enforcement of those laws. In holding that a court can bind non-parties pursuant to a court order, *New York Telephone* itself recognized the well established principle that: "citizens have a duty to assist in the enforcement of the laws[.]" *New York Telephone,* 434 U.S. 159, 175, n. 24, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977).

Similarly, a consent judgment sometimes enforces the law. Here, all parties and the district court agree that Detroit violated the Clean Water Act. Presumably, the consent judgment was agreed upon, in part, to save the time and expense of litigation required to "prove" this uncontested point.[1] The district court's sanctioning of the agreement was clearly more than just a "stamp of approval". If not, why has no party contested the district court's authority to reject the first draft of the agreement in February 1999? If this were simply a private contract, the court would have no role in its genesis. While a contract between private parties might properly be viewed as the "voluntary agreement" discussed in *Thorne,* here, the district court's entry of the judgment operated as broadly as a ruling after a full trial. The force of a consent judgment is well established within our judicial system:

1. This Circuit has recognized the important role that consent judgments play in the efficiency of government, especially when entered into by public institutions: "The decrees reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions." *Heath v. DeCourcy,* 888 F.2d 1105 (6th Cir.1989). Today, the majority's ruling weakens the value of consent judgments to the smooth and efficient running of both the federal courts and government in general. As we recognized in *Heath,* consent judgment between public institutions are "fundamentally different" than consent decrees between private parties. *Heath,* 888 F.2d at 1109.

It is a contract between the parties to the agreement, operates as an adjudication between them and, when the court gives the agreement its sanction, becomes a judgment of the court. The fact that the judgment is by consent gives it, neither greater nor less force than if rendered after protracted litigation.... It has the same weight and effect as any other judgment and, unless vacated or set aside, stands as a final determination of the rights of the parties.

BLACK'S LAW DICTIONARY 842 (6th ed.1990) (quoting *Traveler's Ins. Co. v. U.S.*, 283 F.Supp. 14, 28 (S.D.Tex.1968) (internal citations omitted)).

Therefore, I would rule that the district court had the authority under the All Writs Act to order the Corps to accepted the waste material.

*The Injunction*

The final issue is whether the district court abused its discretion in ordering the Corps to accept the dredged sediment from Conner Creek. Since the majority found that the district court acted outside of its jurisdiction, it never addressed this issue.

We review a district court's grant of an injunction for an abuse of discretion. *See In re Dublin Securities, Inc.*, 133 F.3d 377 (6th Cir.1997); *Golden v. Kelsey–Hayes Co.*, 73 F.3d 648, 653 (6th Cir.1996). A court abuses its discretion in granting an injunction if it incorrectly applies the law or relies on clearly erroneous findings of fact. *See Golden*, 73 F.3d at 653. Thus, in reviewing a district court's grant of an injunction, the Panel reviews the district court's conclusions of law *de novo* and its findings of fact for clear error. *See id.*

The Corps contends that the district court erred because (1) the Corps has not frustrated the consent judgment; (2) the Corps is not part of the underlying controversy; (3) the district court's order impos-

es a substantial burden on the Corps and may have significant adverse impacts on the environment; (4) Detroit failed to show the absence of feasible alternatives for the disposal of the sediment; and (5) the district court's order is not "agreeable to the usages and principles of law."

Here, the district court judge has been closely supervising this case for almost twenty-five years and he is in the best position to determine many of these issues. All of his determinations were well within his discretion and this Court should not second guess them. Therefore, I would affirm the decision.

First, the Corps contends that it is not frustrating the Judgment or any other orders of the district court. It notes that it has not denied Detroit permission to dispose of the sediment at the CDF, but rather was in the process of negotiating with the defendants when Michigan and the DWSD moved for an order compelling the Corps to accept the sediment. The Corps contends that their failure to agree was not sufficient justification to trigger implementation of the All Writs Act. Moreover, the Corps notes that the various deadlines in effect could be relaxed by either Michigan or the district court.

The district court's main concern was that Detroit needed to have a named disposal site for the Conner Creek dredged materials finalized by November 22, 2000 in order to obtain funding from the state. The court noted that if the disposal site was not finalized, DWSD ratepayers would incur an estimated $40,000,000 in additional interest charges.

The Corps' contention that Michigan or the district court could extend the various deadlines is not realistic, and disregards the district court's findings that time is of the essence. Moreover, nothing in *New York Telephone* requires parties seeking a writ to seek the extensions that the Corps

has suggested. Therefore, the district court acted well within its discretion when it ruled that the Corps was frustrating the district court's judgment by not accepting the dredged materials.

Next, the Corps contends that it is not sufficiently part of the underlying controversy to warrant issuance of the district court's order. Specifically, the Corps suggest that under *New York Telephone,* they must be facilitating criminal activity to be subject to an order under the All Writs Act.

This argument is without merit. In *New York Telephone,* the Supreme Court never suggested a distinction between criminal and civil conduct. The Court only required that the Company not be "so far removed from the underlying controversy that its assistance could not be permissibly compelled." 434 U.S. at 174, 98 S.Ct. 364. The Court noted that the Company was in a position to assist, that the Company has a "substantial interest" in providing assistance, and the Company regularly installed pen registers in its own course of dealings. *Id.*

Similarly, here, the Corps is in a position to assist, it has a substantial interest in ensuring that the environmental problems created by the sewage runoff is dealt with in an timely manner, and the CDF's sole purpose is to accept dredged materials from local rivers. Accordingly, the Corps is not "so far removed from the underlying controversy that its assistance could not be permissibly compelled." *New York Telephone,* 434 U.S. at 174, 98 S.Ct. 364.

The Corps also contends that the court's order imposes a substantial burden on the Corps, and may have significant adverse impacts on the environment. The Corps argues that the sediment from Conner Creek has elevated contaminant levels, and that special procedures would be necessary to dispose of the sediment. Further, the Corps suggests that the sediment *may*

impact the environment, but it will not know that until it reviews the potential adverse impacts of such disposal.

While the Corps contends that the district court erred in determining that its order would not significantly burden the Corps, it does not point to any evidence in the record that supports its position. The Corps' emphasis on the contaminant levels of the sediment is misplaced. While the levels are higher than the levels of the sediment the Corps typically places at its CDF, the levels are far less than what is considered dangerous in the soil in residential yards. Accordingly, any suggestion that such contaminants may pose potential environmental risks appears to be without merit.

Furthermore, the Corps argues that the district court erred by finding that Detroit and Michigan proved the absence of feasible alternatives and that the CDF was feasible. However, Detroit clearly investigated the option of on-site dewatering of the sediment, but members of the public strenuously opposed that course of conduct. Detroit also submitted evidence demonstrating that it had considered several alternatives. Moreover, the Corps has not suggested any alternatives. Therefore, the district court was within its discretion to find that Detroit had exhausted all feasible alternatives.

Finally, the Corps claims that the district court's order is not "agreeable to the usages and principles of law" as required by the All Writs Act. 28 U.S.C. § 1651(a). The Corps contends that the district court failed to confront the inconsistency of its order and the law governing the Corps' operation of the CDF. The Corps argues that "ordering the Corps to accept the Conner Creek sediment at Pointe Mouillee, without allowing the Corps to first evaluate the impacts of such disposal on the environment and to determine whether such disposal would be in the public inter-

est, directly contravenes the National Environmental Policy Act and the Clean Water Act." The Corps argues that, pursuant to NEPA and agency regulations, it is either obligated or has discretion to conduct additional NEPA review before deciding whether to accept the sediment, something that the district court ignored.

The district court found that the Corps did not need to conduct additional NEPA review prior to accepting the dredged materials. *United States v. Michigan,* 122 F.Supp.2d at 792. The district court based this conclusion upon the applicable laws and the CDF Agreement as well as the record evidence submitted by the parties. The court noted that the Corps agreed that it was not legally precluded from accepting the materials, and that the toxicity of the materials was below the hazardous levels. The court also considered that the State of Michigan favored placement of the sediment in the CDF.

NEPA requires an agency to prepare an Environmental Impact Statement ("EIS"), or a Supplemental EIS ("SEIS"), only when it is proposing to take "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). Because the action proposed here is simply the depositing of sediment at the CDF, it is not a "major federal action" requiring an EIS or SEIS. *See, e.g., Township of Ridley v. Blanchette,* 421 F.Supp. 435 (E.D.Penn.1976) (noting that "major federal action" is generally large projects involving sizable federal funding, large increments of time for the planning and construction stages, and the reshaping of large areas of topography). While the dredging project itself requires an EIS, the district court correctly determined that, under applicable law, the deposit of the sediment at the CDF does not require an SEIS. *See, e.g., Upper Snake River v. Hodel,* 921 F.2d 232 (9th Cir.1990) (holding that the continued operation of projects for

which an original EIS was conducted does not constitute a "major federal action" or otherwise require a SEIS).

Therefore, the district court did not err in determining that its order was consistent with existing laws and regulations. While it seems that the Corps has discretion to prepare an Environmental Assessment, the district court determined that the Corps had significant time to prepare such an EA, but failed to do so. Moreover, the district court found that the Corps' acceptance of the dredged materials needed to occur immediately.

Because the district court was within its discretion to order the Corps to accept the dredged material, I would affirm the judgment of the Honorable John Feikens of the United States District Court for the Eastern District of Michigan.